EFECTOS LITOGRÁFICOS, C. A., demandante y recurrida, *v.* NATIONAL PAPER & TYPE COMPANY OF PUERTO RICO, INC., demandada y recurrente.

Número: R-81-508 Resuelto: 31 de marzo de 1982

390

*Leopoldo C. Delucca*, abogado de la recurrente; *José A. Suro*, de *Amadeo & Suro*, abogado de la recurrida.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

Efectos Litográficos, C. A., la demandante recurrida, instó acción contra National Paper & Type Company of Puerto Rico, Inc. ante la Cámara Civil y Comercial de la Tercera Circunscripción del Juzgado de Primera Instancia del Distrito Nacional de la República Dominicana. Reclamó RD$150,000 bajo la Ley sobre Protección a los Agentes Importadores de Mercaderías y Productos, Ley Núm. 173 de 6 de abril de 1966, según enmendada por la Ley Núm. 622 de 28 de diciembre de 1973, por daños sufridos por la acción de National Paper al sustituirla alegadamente como agente exclusivo en República Dominicana. Esta legislación dominicana es casi idéntica a nuestra Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 278 *et seq.*

El caso se vio en rebeldía. El tribunal dominicano condenó a National Paper y su filial dominicana a pagar RD$300,000 por los daños morales y materiales sufridos, más los intereses legales, el 1% mensual de esa suma a partir de la demanda, lo que montaba a 4 de junio de 1979 a RD$120,000, más las costas. National Paper apeló sin éxito la sentencia a la Corte de Apelación de Santo Domingo y luego recurrió en casación. El 4 de mayo de 1979 la Suprema Corte de la República Dominicana rehusó alterar el fallo.

Efectos Litográficos demandó entonces ante el Tribunal Superior de Puerto Rico en solicitud de cobro de las sumas concedidas bajo la sentencia extranjera. National Paper presentó como defensas afirmativas, entre otras, que la

sentencia dominicana "no puede ser reconocida en los Estados Unidos y por consiguiente en esta jurisdicción" por falta de reciprocidad, ya que el país que la dictó no reconoce las sentencias emitidas en Estados Unidos; que la sentencia extranjera es contraria al orden público; que ofende los principios elementales de justicia; y que el fallo no se rindió por un tribunal imparcial.

Efectos Litográficos presentó a continuación una moción de sentencia sumaria, a la que acompañó copia de la sentencia dominicana y otros documentos judiciales, junto a copia de la legislación extranjera en que se fundó el fallo. National Paper ripostó con su propia solicitud de sentencia sumaria, en que sostiene que la sentencia dominicana carece de ejecutabilidad en este caso, por las razones expuestas en la contestación y, además, por dictarse en violación del debido proceso de ley, por haber mediado fraude o colusión y por haberse cometido manifiestos errores de hecho y de derecho. National Paper hizo alegaciones —algunas generales, otras específicas— y acompañó declaraciones juradas y otros documentos para intentar sostener su posición. Nos referiremos en detalle más tarde a los planteamientos efectuados por las partes en sus mociones de sentencia sumaria.

El 30 de octubre de 1981 el Tribunal Superior dictó sentencia sumaria a favor de Efectos Litográficos. En vista de que esta empresa había ejecutado ya parcialmente en la República Dominicana la sentencia que nos ocupa, el tribunal anunció que señalaría vista para determinar el montante del balance adeudado por National Paper.

National Paper recurrió ante este foro y el 22 de diciembre de 1981 dictamos orden de mostrar causa por la cual no debe revocarse la sentencia sumaria por existir controversia sobre algunos hechos esenciales.

Se plantea aquí de lleno el tema vital del reconocimiento y ejecución de las sentencias extranjeras. Examinemos en primer término la historia del tratamiento en nuestro

derecho de este aspecto del Derecho internacional privado para determinar entonces las normas que corresponde seguir o establecer.

## I

*El historial*

La Ley de Enjuiciamiento Civil española de 13 de mayo de 1855, enmendada por el R. D. de 3 de febrero de 1881 y extendida en su nueva forma a Puerto Rico el 25 de setiembre de 1885, disponía en sus Arts. 951 a 958 (correspondientes a los Arts. 922 a 929 de la ley anterior, vigente en Puerto Rico desde 1865) la manera y circunstancias en que podría darse cumplimiento en el país a las sentencias extranjeras. En ausencia de tratado, se sentaba el principio de la reciprocidad: las sentencias extranjeras tendrían la misma fuerza que se les diese en la nación concernida a las ejecutorias dictadas en España. Las sentencias tenían que ser lícitas en España y Puerto Rico y, entre otros requisitos, no podían haber sido dictadas en rebeldía (Art. 954, apdo. 3° de la Ley de 1881 y el Art. 925, apdo. 3° de la Ley de 1855). Estas disposiciones todavía representan el núcleo del derecho español sobre el tema. A. Miaja de la Muela, *Derecho Internacional Privado*, 8va ed., Madrid, Ed. Atlas, 1979, Vol. II, pág. 510; Aragoneses Alonso, *Procedimiento para el Exequátur de Sentencias Civiles Extranjeras en España*, 8 Rev. de Derecho Procesal 551 (1952).

El Código de Enjuiciamiento Civil de 1904 no incluyó disposición alguna sobre el exequátur o procedimiento para autorizar la ejecución de una sentencia extranjera, pero la Ley de Evidencia de 9 de marzo de 1905 proveyó en su Art. 66, tomado de California:

El efecto del fallo de cualquier otro tribunal de país extranjero con jurisdicción para dictarlo, es como sigue:

1. En el caso de un fallo contra una cosa específica, el fallo es concluyente, en cuanto al título de la cosa.

2. En todos los demás casos el fallo constituye evidencia indirecta de un derecho entre las partes y sus sucesores en interés por título adquirido con posterioridad, y sólo puede rechazarse mediante evidencia de carencia de jurisdicción, falta de notificación a la parte, colusión, fraude o manifiesto error de hecho o de derecho.

En la edición del Código de Enjuiciamiento Civil de 1933 este artículo de la Ley de Evidencia recibió el Núm. 428 (32 L.P.R.A. sec. 1800). Otros artículos de la Ley de Evidencia, que también tratan sobre aspectos del exequátur que no viene al caso discutir aquí, también fueron incluidos en la referida edición del Código de Enjuiciamiento Civil.

Las Reglas de Procedimiento Civil de 1979 derogaron los artículos del Código de Enjuiciamiento Civil que quedaron vigentes en virtud de la Regla 72 de Procedimiento Civil de 1958, entre los que se contaba el Art. 428 citado. Las Reglas de Evidencia de 1979 también derogaron expresamente, en su Art. 84, el Art. 428 del Código de Enjuiciamiento Civil y por ende el Art. 66 de la antigua Ley de Evidencia. Ello obedeció a todas luces al criterio de que el exequátur representa una materia sustantiva que debe ser parte de la sección del Código Civil que trata de normas referentes al Derecho internacional privado. Recuérdese, además, que la Regla 72 de Procedimiento Civil derogó la Ley de Enjuiciamiento Civil para España y Ultramar.

▋ La situación presente es, por lo tanto, que no existe en Puerto Rico, fuera de disposiciones aisladas, legislación abarcadora sobre el exequátur que sirva de guía para la decisión de este caso. Estados Unidos, aunque ha suscrito un acuerdo bilateral con el Reino Unido sobre este particular, no ha negociado tratado alguno con la República Dominicana sobre el asunto. Estados Unidos es parte del convenio multilateral para el reconocimiento y ejecución de laudos extranjeros de arbitraje, 21 U.S.T.

2517, T.I.A.S. No. 6997, 330 U.N.T.S. 38, pero no se ha adherido al Convenio de La Haya de 1969 sobre la ejecución de sentencias extranjeras. Miaja de la Muela, *op. cit.*, págs. 508–509; Scoles y Aarnas, *The Recognition and Enforcement of Foreign Nation Judgments: California, Oregon and Washington*, 57 Ore. L. Rev. 371, 395 (1978). Tampoco ha aceptado el Código Bustamante ni el Congreso ha legislado sobre el particular. La cláusula sobre entera fe y crédito de la Constitución estadounidense no se aplica a decisiones extranjeras. Wurfel, *Recognition of Foreign Judgments*, 50 N.C.L. Rev. 21, 69 (1971).

■ Conforme el mandato del Art. 7 del Código Civil, 31 L.P.R.A. sec. 7, este Tribunal debe en consecuencia proceder a estructurar en este caso las normas de Derecho internacional privado, mas de acuerdo con los principios generales del derecho y los usos y costumbres aceptados y establecidos. Pueden y deben examinarse distintas tradiciones jurídicas. La meta es la identificación de la *communis opinio*, la búsqueda de las reglas que mejor sirvan los valores envueltos.

II

*La estructuración de las normas*

A. *Los valores a servir*

■ El reconocimiento y ejecución de las sentencias extranjeras se justificaban inicialmente bajo principios de deferencia. Luego se estimó que tal deferencia hallaba su apoyo en la doctrina de *res judicata*. Reese, *The Status in this Country of Judgments Rendered Abroad*, 50 Colum. L. Rev. 783, 784 (1950). Hoy se admite que el conjunto de intereses a sopesar es mucho más complejo. Algunos de esos intereses son: el deseo de evitar el derroche de recursos y la duplicación de esfuerzo que entraña la relitigación de un asunto; la preocupación por proteger a los litigantes victoriosos en otros foros de las tácticas

evasivas y dilatorias de los litigantes vencidos; la importancia de evitar el parroquialismo y su influencia en la selección del foro por el demandante; el interés en promover la unidad y la estabilidad en el orden internacional jurídico; la condición en muchos casos del foro requirente como el más indicado para la decisión del asunto; el respeto debido a las nociones de orden público del foro requerido, así como a nociones sobre la justicia prevalecientes en la comunidad internacional. Von Mehren y Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach*, 81 Harv. L. Rev. 1601, 1603–1604 (1968).

Existen posiciones muy variadas sobre el exequátur. En un extremo, Holanda no lo reconoce en forma alguna. Se les ha prohibido a los tribunales por legislación que autoricen la ejecución de sentencias extranjeras en tal país. Von Mehren y Trautman, *op. cit.*, pág. 1602. Bélgica y Quebec permiten la revisión en sus méritos de la sentencia dictada. M. J. Whiteman, *Digest of International Law*, Vol. 6, Dept. of State, 1968, pág. 29. España permite una revisión limitada del fondo de la decisión. Telo Álvarez, *El reconocimiento y la ejecución, en territorio español, de las decisiones judiciales extranjeras en materias civiles o mercantiles*, Rev. de Derecho Procesal Iberoamericano, Año 1973, págs. 873, 879. Al otro extremo, tras muchas otras gradaciones, se halla la doctrina, vigente en Estados Unidos hasta finales del siglo diecinueve, que ordena la emisión automática o cuasiautomática del exequátur.

La doctrina más favorecida actualmente, tanto en el Derecho civil como el común angloamericano, es de naturaleza intermedia. La regla general ordena la emisión del exequátur, mas la sentencia extranjera debe cumplir con ciertos requisitos básicos para merecer su cumplimiento en el foro requerido. H. Batiffol y P. Lagarde, *Droit International Privé*, 6ta ed., T. II, 1976, Ed. Pichon y Durand-Auzias, París, pág. 476 *et seq.*; Restatement of the

Law Second, *Conflict of Laws*, 1980, sec. 98 *et seq.*; Whiteman, *op. cit.*, pág. 226 (sobre el Derecho inglés); Süs, *Reconocimiento de Sentencias Extranjeras*, 8 Rev. Derecho Procesal 3 (1952).

■ Adoptamos esta posición intermedia, representativa de la *communis opinio*, Süs, *op. cit.*, pág. 4, por estimar que es la que reconcilia más eficazmente los intereses en conflicto. La regla en Puerto Rico será en consecuencia el reconocimiento y la ejecución de las sentencias extranjeras, sujeto a las limitaciones que se enumeran más adelante. Para determinar las limitaciones procedentes, examinemos las establecidas o consideradas generalmente en el Derecho civil y en el Derecho común angloamericano. Retendremos las que más propendan a realzar los valores que animan la concesión o denegatoria del exequátur. Comencemos por examinar el tratamiento del problema en este mismo foro cuando la situación legislativa, como hemos visto, era diferente.

### B. *La jurisprudencia puertorriqueña*

La norma general que hemos anunciado no es nueva en esta jurisdicción, aunque cambiará la naturaleza de algunas de sus excepciones. Los dos casos en que este Tribunal se ha expresado *in extenso* sobre el exequátur reflejan la norma general, si bien se resolvieron ambos bajo condiciones diferentes a las actuales.

En *Ponce* v. *F. Badrena e Hijos, Inc.*, 74 D.P.R. 225 (1952), resolvimos que las sentencias extranjeras debían reconocerse y cumplirse en Puerto Rico, a menos que se dieran las condiciones que requería el Art. 428 del Código de Enjuiciamiento Civil, hoy derogado, para negarle obligatoriedad. Los fallos podían rechazarse, por tanto, si se probaba carencia de jurisdicción, falta de notificación a la parte, colusión, fraude o manifiesto error de hecho o de derecho. Pág. 245. A estos factores les añadimos los requisitos de un debido proceso de ley, que la sentencia no

sea contraria al orden público local, que no sea tan claramente arbitraria que sea contraria a los principios elementales de la justicia esencial y que se haya dictado por un tribunal imparcial. Pág. 243. En *F. Badrena* discutimos si debe establecerse también el requisito de la reciprocidad, mas no llegamos a una conclusión sobre este extremo.

En *Ramírez* v. *Registrador*, 96 D.P.R. 342, 357–358 (1968), señalamos la importancia del Art. 11 del Código Civil como base para el requisito de que la sentencia extranjera no puede contravenir "el orden público y las buenas costumbres". Reiteramos allí los criterios de *F. Badrena*, supra, págs. 358, 360.

Examinemos a continuación, dada la eliminación de varias de las bases en que se fundan *F. Badrena* y *Ramírez*, los requisitos que limitan la norma general de ejecutabilidad antes expuesta.

## C. *El criterio de la reciprocidad*

El Tribunal Supremo de Estados Unidos ha resuelto que las sentencias extranjeras deben tener la fuerza en las cortes federales que tengan las sentencias norteamericanas en el país requirente. *Hilton* v. *Guyot*, 159 U.S. 103, 226–227 (1895). Hace casi treinta años, en *F. Badrena*, supra, pág. 240, señalamos la crítica severa a que había sido sometido este aspecto de *Hilton*. *Hilton* no representa hoy la doctrina de muchos estados de la Unión Americana y la generalidad de los comentaristas la rechaza. Restatement Second, *Conflict of Laws*, Vol. 1, 1971, págs. 299–300; Reese, *The Status in this Country of Judgments Rendered Abroad*, supra, pág. 788; Von Mehren y Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach*, supra, pág. 1660 *et seq.*; A. Ehrenzweig, *A Treatise on the Conflict of Laws*, St. Paul, West Publishing Co., 1962, págs. 164–166; Lenhoff, *Reciprocity and the Law of Foreign Judgments: A Historical-Critical Analysis*, 16 La. L. Rev. 465, 471 *et seq.* (1956); Scoles y Aarnas, *The*

*Recognition and Enforcement of Foreign Nation Judgments: California, Oregon and Washington*, supra, pág. 381. En Estados Unidos se considera hoy que aun las cortes federales, después de *Erie Railroad Co.* v. *Tompkins*, 304 U.S. 64 (1938), vienen obligadas a acatar el derecho estatal y no la regla de *Hilton*. Restatement Second, *supra*, pág. 300.

En Inglaterra se critica también duramente la doctrina de la reciprocidad, a pesar de la situación legislativa. G. C. Cheshire, *Private International Law*, 7ma ed., 1974, London, Sweet & Maxwell, pág. 618.

En España continúa en vigor la antigua legislación de 1855, según enmendada en 1881, que incorporaba la doctrina de reciprocidad. La doctrina ha sido atacada. Süs, *Reconocimiento de Sentencias Extranjeras*, supra, pág. 6.

La Corte de Casación de Francia ha rechazado expresamente la regla de reciprocidad. H. Batiffol y P. Lagarde, *Droit International Privé*, 6ta ed., París, Pichon y Durand-Auzias, 1976, T. II, pág. 498 *et seq.*; y Loussouarn y P. Bourel, *Droit International Privé*, París, Dalloz, 1978, pág. 619 *et seq.*

■ A pesar de que en varios países subsiste la doctrina de la reciprocidad, no consideramos procedente el retorno en nuestro caso al derecho imperante sobre este particular en Puerto Rico hacia fines de siglo. Es cierto que esta doctrina favorece que otros países puedan tender a reconocer y autorizar el cumplimiento de las sentencias extranjeras, pero no siempre ha promovido la unidad internacional y, por lo demás, sacrifica otros valores significativos que hemos reseñado. Resulta mucho más preferible la continuada expansión del movimiento en respaldo de la aceptación, aunque sea unilateral, del exequátur, con determinadas limitaciones. Ello añade a la deseada certeza del Derecho internacional privado. E. Vita, *Diritto Internazionale Privato*, Turín, 1972, Vol. 1,

págs. 452–453. No admitimos la reciprocidad como requisito limitante en Puerto Rico a la norma general que hemos adoptado sobre el cumplimiento de las sentencias extranjeras.

### D. *La revisión en los méritos*

Como hemos visto, el Art. 428 del Código de Enjuiciamiento Civil de Puerto Rico permitía negar el exequátur si el tribunal extranjero había cometido manifiesto error de hecho o de derecho. En *Ramírez*, supra, pág. 360, nos expresamos en contra de conocer de los méritos o el fondo del asunto objeto de la sentencia extranjera. Nuestra expresión en *Ramírez* apuntaba a lo que constituye hoy la norma preferida en muchos países donde rige el Derecho común o el civil.

Lo sucedido en Francia es de especial interés. Desde principios del siglo diecinueve se permitía la revisión en los méritos de las sentencias extranjeras por los tribunales franceses mas, sin mediar legislación, la situación cambió diametralmente en la segunda mitad de este siglo. El 7 de enero de 1964, en el caso *Munzer* (J. 1964.302, note Goldman, J.C.P. 1964.II.13590, n. Ancel, R.1964.344), la Corte de Casación prohibió la revisión del fondo de las sentencias extranjeras como condición para la emisión del exequátur. Batiffol y Lagarde, *op. cit.*, pág. 499 *et seq.* Tal revisión puede ocurrir únicamente de modo incidental, como medio tan solo para determinar el cumplimiento con criterios tales como el de la consonancia con el orden público, a discutirse más adelante.

En Quebec también se ha abandonado la teoría de la revisión a fondo como condición del exequátur, así como en algunos otros países civilistas. Batiffol y Lagarde, *op cit.*, pág. 501, n. 47. En Italia se autoriza la revisión en los méritos tan solo cuando la sentencia extranjera se ha dictado en rebeldía (Art. 798 del Código de Procedimiento Civil). En España también se permite una revisión limitada. Telo Álvarez, *supra*, págs. 879–880.

En el Derecho inglés no se permite la revisión de una sentencia extranjera por error de hecho o de derecho. *Godard* v. *Gray* [1807] L. R. 6 Q. B. 139; R. H. Graveson, *Conflicts of Laws,* 7ma ed., Londres, Sweet & Maxwell, pág. 628 *et seq.* En el Derecho norteamericano tampoco se permite generalmente, excepto cuando es indispensable para determinar la existencia de alguna otra condición limitante. Reese, *The Status in this Country of Judgments Rendered Abroad,* supra, pág. 789; Restatement Second, *Conflict of Laws,* Sec. 106, pág. 319.

 Resolvemos que no es permisible en Puerto Rico la revisión en sus méritos de las sentencias extranjeras. La comisión por el tribunal extranjero de errores de hecho o de derecho no tiene pertinencia al asunto de la ejecutabilidad de la sentencia en este foro. Las sentencias extranjeras podrán examinarse en su fondo como medio tan solo para precisar la existencia de factores limitativos del exequátur. Le negamos pertinencia a la comisión de errores de hecho o de derecho por considerar que la regla contraria atenta contra el orden internacional y en realidad anula los objetivos centrales del juicio de exequátur.

E. *La jurisdicción del tribunal*

Hay acuerdo prácticamente general entre el derecho civil y el angloamericano sobre la necesidad de que la sentencia extranjera se dicte por un tribunal con jurisdicción sobre la persona y el asunto como condición para su reconocimiento y ejecutabilidad en el exterior. *Munzer,* supra; Restatement Second, *supra,* Sec. 98, comentario (c); Art. 4(1) del Convenio de la Haya (Whiteman, *supra,* pág. 137).

 Mantenemos en vigor esta regla en Puerto Rico. Expresamos, no obstante, que debe distinguirse entre las situaciones en que la jurisdicción sobre la persona puede adquirirse vía emplazamiento y aquellas en que es indis-

pensable la utilización del exhorto o la comisión rogatoria. (¹)

## F. *La competencia del tribunal*

■ También constituye norma general requerir que la sentencia extranjera se dicte por tribunal competente. La competencia se medirá por las reglas del país extranjero. Batiffol y Lagarde, *op. cit.*, pág. 477 *et seq.*; Restatement Second, *supra*, Sec. 105; Whiteman, *op. cit.*, pág. 226. Adoptamos esta otra condición limitadora.

## G. *Sentencia obtenida por fraude*

■ Este requisito es también admitido generalmente. (De no especificarse, favor de referirse a las autoridades citadas anteriormente.) (²)

## H. *Naturaleza adversaria del procedimiento*

En Italia y, parcialmente, en Estados Unidos se condiciona la emisión del exequátur a que la sentencia extranjera se haya emitido en un procedimiento adversario. Las sentencias en rebeldía no tienen derecho al exequátur. Art. 798 del Código de Procedimiento Civil italiano; Restatement Second, *op. cit.*, Sec. 98, comentarios (a) y (d). La gran mayoría de las decisiones estadounidenses consultadas rechazan esta posición del *Restatement,* que tampoco goza de apoyo en muchos otros países. Véanse: *Bank of Montreal* v. *Kough,* 612 F.2d 467 (9th Cir. 1980); *Somportex Limited* v. *Philadelphia Chewing Gum Corp.,* 453 F.2d 435 (3rd Cir. 1971); *Nicol* v. *Tanner,* 256 N.W.2d 796 (1976); *Davidson & Company, Limited* v. *Allen,* 508 P.2d 6 (1973). Contra: *Falcon Manufacturing (Scarborough) Ltd.* v. *Ames,* 278 N.Y.S.2d 684 (1967).

---

(¹) Véase la Convención de La Haya de 1965 sobre la Notificación Legal de Actas Judiciales y Extrajudiciales en el Extranjero, 20 UST 361, TIAS 6638.

(²) Para un enfoque reciente de diversos problemas del exequátur, véase: Von Mehren, *Recognition and Enforcement of Sister-State Judgments: Reflections on General Theory and Current Practice in the European Economic Community and the United States,* 81 Col. L. Rev. 1044 (1981).

▇ No consideramos prudente la imposición de este requisito como condición para la emisión del exequátur en Puerto Rico. El hecho de si el fallo extranjero se dictó en el curso de un proceso adversario puede ser de importancia para determinar si hubo debido proceso de ley, si se violaron las nociones de orden público del foro requerido o principios básicos de justicia o si se infringieron otros criterios. En los casos donde no haya habido, por ejemplo, debida oportunidad de ser oído, bien podría considerarse, como regla general, que la sentencia extranjera no debe reconocerse. Mas si hubo tal oportunidad ante tribunal extranjero competente y con jurisdicción sobre la persona y el asunto, pero el demandado no se valió de ella, procedería el exequátur, de cumplirse con las otras condiciones que estamos estableciendo. Dejar en manos de los demandados, debidamente sujetos al fallo extranjero, la facultad de resolver o no si se declaran en rebeldía equivale a minar la eficacia del exequátur. Si el fallo extranjero, sin embargo, se dicta sin jurisdicción, no es merecedora de reconocimiento la sentencia resultante en rebeldía. Convenio de La Haya, Arts. 6 y 9; Whiteman, *op. cit.*, págs. 237–238.

I. *Sentencia dictada sin debido proceso de ley*

▇ Este es otro requisito generalmente aceptado. Batiffol y Lagarde, *op. cit.*, pág. 476; Restatement Second, *supra*, Sec. 104. Lo adoptamos en esta jurisdicción.

J. *Sentencia dictada por tribunal parcializado*

▇ Se requiere también usualmente que el sistema bajo el que se dicte la sentencia se distinga por su imparcialidad y ausencia de prejuicio contra el extranjero. Ya en *F. Badrena* reconocimos la indispensabilidad de este requisito. Véase también: Restatement Second, *supra*, págs. 298–299.

La imputación de parcialidad no podrá hacerse livianamente. La carga de la prueba, que es pesada, recae sobre el litigante vencido.

K. *Sentencias contrarias al orden público*

 Las sentencias extranjeras contrarias al orden público del foro requerido o local no son acreedoras a reconocimiento o cumplimiento. Esta regla es también parte de la *communis opinio*. Batiffol y Lagarde, *op. cit.*, págs. 476, 489–491, 495 *et seq.*; Restatement Second, *supra*, pág. 340; *Administration of Justice Act 1920*, Sec. 9(2)(f); 3 *Halsbury's Statutes of England*, 3ra ed., Vol. 6, pág. 354; Convenio de La Haya, Art. 5(1); Whiteman, *op. cit.*, pág. 237; Código Bustamante, Art. 423.

L. *Sentencias contrarias a los principios básicos de la justicia*

Anunciamos esta condición en *F. Badrena*, pág. 243. Aunque el principio es peligrosamente lato y hace tangencia con elementos de otros requisitos, tiene su utilidad, de emplearse cuidadosamente, para promover el tratamiento internacional uniforme de ciertas cuestiones por los países más civilizados. Reese, *op. cit.*, pág. 795 *et seq.* Como protección contra la arbitrariedad y actos no cubiertos por las condiciones anteriores retendremos este requisito.

### III

*La aplicación de las normas al caso presente*

La enumeración efectuada de las normas de Derecho internacional privado que regirán, en ausencia de tratado o legislación especial, el reconocimiento y la ejecución de las sentencias extranjeras en Puerto Rico ha sido de por fuerza somera. Hemos omitido la discusión de los serios problemas conflictuales que plantean muchos de los conceptos utilizados. Nos hemos limitado a exponer la norma general y sus excepciones principales, con el detalle necesario tan solo para poder resolver el recurso específico pendiente. La elaboración de lo expuesto deberá aguardar otros pleitos en que se planteen otras cuestiones de Derecho internacional privado que están latentes en lo

discutido hasta ahora. Debemos advertir también que las reglas sentadas se aplicarán principalmente a casos en que la sentencia extranjera imponga el pago de determinada suma de dinero. En otros tipos de casos puede que se justifiquen ciertas variaciones en los principios enunciados.

En el recurso de autos existe controversia sobre si la República Dominicana reconoce las sentencias de Estados Unidos y Puerto Rico. Esta controversia no basta para derrotar la sentencia sumaria ya que no hemos aceptado en este foro la reciprocidad como condición del exequátur.

Por razones que indicaremos más adelante era improcedente dictar sentencia sumaria en este caso, por lo que deberán dilucidarse en vista ante el Tribunal Superior las controversias de hecho que señalaremos. Ya que hemos rechazado en esta jurisdicción el principio de la revisión en sus méritos de las sentencias extranjeras, el tribunal de instancia no permitirá que la parte recurrente relitigue los méritos de la controversia. Se admitirá prueba tan solo sobre aquella parte de los méritos, si alguna, que sea necesaria para esclarecer la aplicación de las normas aquí sentadas respecto a la procedencia o no del exequátur.

En lo que toca a la tercera condición para la ejecución del exequátur, National Paper sostiene que el tribunal extranjero actuó sin jurisdicción. A tal efecto ataca la validez del emplazamiento. Ya tenemos aquí, mezclada entre cuestiones de Derecho, una controversia sobre hechos esenciales. El estado del récord no nos permite resolver si el tribunal extranjero adquirió o no jurisdicción sobre National Paper. ¿Es este un caso, además, donde la única forma de adquirir jurisdicción es a través del exhorto? Al presentar prueba sobre estos particulares el tribunal de instancia deberá requerir también que se argumente por las partes el problema conflictual de la ley aplicable a la materia de la jurisdicción.

Sobre el cuarto requisito, la competencia del tribunal,

no se ha planteado controversia y tampoco se recibirá prueba sobre ello.

Conectado al problema de la jurisdicción y a otros criterios está el asunto de la rebeldía. ¿Cuáles son los verdaderos hechos sobre el particular? ¿Hubo sumisión voluntaria por parte de National Paper? ¿Cuál es el efecto, como cuestión de hecho, de la rebeldía sobre los otros criterios adoptados aquí? .

La parte recurrente alega que la sentencia dictada está viciada de fraude. Esta es una imputación de extrema gravedad que expone a quien la haga frívolamente a responsabilidades serias. La simple alegación de fraude no detiene el exequátur ni impide que se dicte sentencia sumaria. La parte recurrente ha alegado hechos que, aunque escuetos, permiten que intente descargar en la vista que se celebre el pesado fardo de la prueba en estos casos.

También alega la parte recurrente que se ha violado el debido proceso de ley. Su alegación sobre el particular es bastante vaga. Deberá rechazarse, a menos que se concrete en la vista como condición separada o como parte de otros de los requisitos aquí reseñados.

La parte recurrente sostiene que la sentencia extranjera se dictó por un tribunal parcializado. Esta es otra imputación que sólo deberá formularse tras la consideración más detenida de la prueba disponible. Reiteramos que la sentencia sumaria representa un procedimiento perfectamente legítimo para la obtención del exequátur y que solo podrá derrotarse con la exposición de hechos específicos que demuestren la existencia de una controversia a dilucidarse por el tribunal de instancia. No basta con la alegación desnuda de las condiciones que hemos expuesto aquí. *García Cruz* v. *El Mundo, Inc.*, 108 D.P.R. 174 (1978). National Paper cita en apoyo de esta alegación tan solo dos párrafos de la opinión extranjera ante el tribunal de primera instancia. Si esta es toda la prueba en

que se apoya la recurrente, su planteamiento es inmeritorio.

Se sostiene, por último, por la recurrente que la sentencia extranjera es contraria al orden público y a los principios básicos de la justicia, por cuanto aplicó retroactivamente la ley dominicana para la protección de los distribuidores, acción declarada inconstitucional en lo que respecta a nuestro estatuto análogo en *Warner Lambert Co. v. Tribunal Superior,* 101 D.P.R. 378 (1973), por conceder en rebeldía mayores daños que los solicitados y por otras razones. El récord es insuficiente para permitir la consideración en instancia apelativa de la primera cuestión en particular. Deberán dilucidarse en primera instancia los hechos pertinentes a ella y luego formularse juicio por el tribunal de instancia sobre las cuestiones de derecho planteadas.

*En consideración a lo expuesto, se expedirá el auto, se revocará la sentencia sumaria dictada y se devolverá el caso a instancia para procedimientos compatibles con esta opinión.*

Los Jueces Asociados Señores Dávila y Martín concurren en el resultado sin opinión.