RICHARD H. STERZINGER, peticionario, *v.* HON. ÁNGEL D. RA-
MÍREZ RAMÍREZ, MADELEINE V. CANDELARIO DE EFRÓN, de-
mandados.

*Número:* JO-85-2     *Resuelto:* 17 de diciembre de 1985

764

*Sarah Torres Peralta, Enrique González* y *Roberto De Jesús Cintrón,* abogados del peticionario; *Ángel D. Ramírez Ramírez, pro se; Luis R. Montañez Avilés, Maricarmen Ramos de Szendrey, Antonio J. Amadeo Murga, Carlos Martínez Vélez, Madeleine Candelario, pro se,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Tenemos ante nuestra consideración una continua y acalorada controversia entre el padre de una menor que acude al tribunal para hacer valer su derecho a tener relaciones paterno-filiales con su hija y el interés también legítimo de la madre de que dichas relaciones sean reguladas en forma tal que pueda criarla en un ambiente íntimo y familiar. Tenemos así la oportunidad de expresarnos sobre el derecho de todo progenitor no custodio a continuar las relaciones familiares con sus hijos menores con posterioridad al divorcio.

## I

La Lic. Madeleine Candelario, puertorriqueña, y el Lic. Richard Sterzinger, alemán, se conocieron mientras estudiaban maestría en Derecho en la Universidad de Miami, Florida. Se casaron en Puerto Rico en junio de 1978 y establecieron su residencia en Alemania. Durante el matrimonio procrearon una hija, Sybil, quien nació en Alemania en diciembre de 1979. Debido a desavenencias se separaron en agosto de 1982 y la licenciada Candelario regresó a Puerto Rico con su hija. En mayo del 1983 se divorciaron en Alemania y mediante un acuerdo aprobado judicialmente ella obtuvo la custodia y la patria potestad de la niña. En cuanto a las relaciones paterno-filiales se dispuso que el señor Sterzinger tenía "derecho de visitar a la niña en su residencia, al presente en Puerto Rico, en cualquier momento" (Apéndice, pág. 14.) y la niña lo visitaría en Alemania *todos los años por un período de por lo menos cuatro a ocho semanas.* [1]

---

[1] El acuerdo fue suscrito el 16 de mayo de 1983 ante un notario conforme a las leyes de Alemania y fue archivado, bajo el Núm. 299 del Registro de Escrituras del Notario Dulf Weber. El acuerdo regula todos los asuntos que requieren reglamentación antes de un divorcio en Alemania incluso la división de bienes inmuebles y muebles, custodia, derecho de visita, pensión, contribuciones y otros asuntos. En cuanto a derechos de visitas se acordó en parte:

"(1) Las partes acuerdan que los derechos de visitas serán acordados de forma tal que este año la primera parte [el padre] pueda re-establecer contacto cercano con la niña a través de visitas a Puerto Rico, que dichos derechos de visita serán ejercitados en fines de semana y finalmente que la niña pasará sus períodos de vacaciones con la primera parte;

"(2) Previa notificación apropiada, la primera parte tendrá derecho de visitar a la niña en su residencia, al presente en Puerto Rico, en cualquier momento. Este derecho de visita existirá todos los días durante el período de 9:00 a.m. a 6:30 p.m., disponiéndose que la primera parte tomará conocimiento de los períodos escolares. Al llegar la niña a los 5 años de edad, la primera parte tendrá derechos de custodia sobre la niña durante fines de semanas enteros, comenzando a las 9 a.m. del sábado y concluyendo a las 6 p.m. del domingo, disponiéndose que dichos derechos no pueden ser ejercitados por más de seis fines de semana durante un año calendario." Apéndice, pág. 14.

El 17 de mayo de 1983 las partes se divorciaron por decreto de Amstgericht Darmstadt, Alemania Occidental. Luego de obtener el divorcio, la licenciada Candelario contrajo nupcias con el Lic. David Efrón con quien tuvo otra niña nacida en Puerto Rico.

El peticionario ha tratado en muchas ocasiones de hacer valer el derecho de visitar a su hija conforme a lo pactado en Alemania. Sin embargo, como la licenciada Candelario le había permitido visitar a la niña en sólo una ocasión, el peticionario presentó en diciembre de 1984 una demanda en la que solicita que los tribunales de Puerto Rico reconozcan su derecho a relacionarse con su hija.

En el Tribunal Superior se tramitó este caso como una acción civil ordinaria de relaciones paterno-filiales y se celebró una vista el 12 de diciembre de 1984. En la vista la licenciada Candelario, a través de su esposo el licenciado David Efrón, se opuso a la petición del señor Sterzinger. Después de celebrar la vista el Tribunal Superior no resolvió los asuntos planteados en la demanda. Dada la urgencia del remedio solicitado, el peticionario presentó en febrero de 1985 una solicitud de *certiorari* y de *mandamus* para que ordenáramos al foro de instancia que estableciera un plan de relaciones paterno-filiales. Aunque no expedimos los recursos, ordenamos al tribunal de instancia que tomara las medidas tutelares pertinentes para que el peticionario pudiese visitar a su hija y resolviera prontamente el caso en sus méritos. Para dar cumplimiento a nuestra resolución el foro de instancia señaló vista para el 28 de febrero. A esta vista comparecieron la parte peticionaria y el abogado de la demandada quien informó que la licenciada Candelario había salido de viaje fuera de Puerto Rico acompañada de la niña Sybil.

Al enterarnos a través de otro recurso de la incomparecencia de la licencia Candelario de Efrón, el 20 de marzo de 1985 ordenamos al tribunal de instancia que tomase medidas especiales para que la niña Sybil permaneciera en Puerto Rico

hasta que este Tribunal resolviese finalmente la controversia trabada (²) y que celebrara una vista para determinar si la demandada había incurrido en desacato a nuestra resolución de febrero.

El 19 de abril de 1985 el licenciado Sterzinger volvió a Puerto Rico. Le permitieron ver a su hija en dos ocasiones por un total de cinco (5) horas. En ambas ocasiones la demandada-recurrida grabó en video las visitas a su casa. El peticionario compareció nuevamente ante esta curia y mediante resolución ordenamos al juez de instancia que ampliara el horario de las visitas del señor Sterzinger y que prohibiese el uso de cámaras o instrumentos de reproducción audiovisual.

_____

(²) El 20 de marzo de 1985 este Tribunal emitió dos resoluciones. La primera dispone en parte:

"Informado este Tribunal mediante los escritos de las partes presentados a partir del 8 de marzo de 1985, que [las] vistas señaladas para el 25 y el 28 de febrero de 1985 ante el Tribunal de instancia tuvieron que ser suspendidas debido a la incomparecencia de la demandada Madel[e]ine V. Candelario y de su esposo David Efrón, cuyas vistas se señalaron para hacer efectiva nuestra resolución de 14 de febrero de 1985; e, informado, además, de que quedó frustrada nuestra orden para que el aquí peticionario pudiera tener acceso a su hija de cinco años de edad, de nombre Sybil, en ocasión de su estadía en Puerto Rico entre los días 24 de febrero y 4 de marzo de 1985, debido a que la niña fue trasladada y mantenida fuera de Puerto Rico durante dichos días, el Tribunal resuelve y ordena como sigue:

. . . . . . . . .

"2. . . . . se ordena al Tribunal de instancia que con carácter de inaplazable celebre la conferencia (status conference) que ha señalado para el 9 de abril de 1985 e igualmente mantenga el señalamiento hecho para una vista evidenciaria para el 30 de abril de 1985. Se tomarán las medidas necesarias para que dicha vista pueda continuar en días sucesivos, sin interrupción, hasta recibir todas las pruebas que sean pertinentes a la solución de los problemas de custodia de la niña Sybil y las relaciones que deben mantenerse entre ella y sus padres.

. . . . . . . . .

"5. El Tribunal de instancia tomará medidas para que la niña Sybil sea mantenida físicamente dentro de su jurisdicción hasta que otra cosa se disponga por disposición final y firme. Exigirá de la demandada que mantenga informado al Tribunal en todo momento del lugar específico en que se encuentre la niña, personas que la tengan consigo y números de teléfonos en que se pueda localizar."

Después de varios incidentes adicionales, el tribunal de instancia finalmente celebró la vista correspondiente el 6 de mayo de 1985, y el 7 de mayo las partes presentaron una estipulación que fue aprobada por el tribunal el 13 de mayo de 1985.

Sin embargo, esta estipulación no terminó con el litigio. Hubo varios incidentes adicionales y el 29 de julio de 1985 el señor Sterzinger volvió a este Tribunal y solicitó que nombrásemos un comisionado especial para dilucidar los últimos conflictos entre las partes y que revocáramos varias decisiones del foro de instancia que autorizan a la licenciada Candelario de Efrón a viajar con su hija y limitan los derechos de visita de su padre. Solicitó, además, que revisáramos la resolución del juez de instancia asumiendo jurisdicción en una reconvención para reclamar un aumento de pensión alimenticia.

El 25 y 26 de noviembre el peticionario Sterzinger presentó dos recursos titulados *Moción en Auxilio de Jurisdicción y en Solicitud de Remedios Urgentes* y *Moción Solicitando Remedios Urgentes y Petición de Certiorari*, respectivamente. Se nos informó en esos escritos que la recurrida, licenciada Candelario, había abandonado la jurisdicción de Puerto Rico en compañía de la menor y que, aparentemente, había instalado su domicilio en el estado de Florida. Que una vez radicada en el estado de Florida había presentado un recurso en los tribunales de ese estado para que se reconociese allí la validez del dictamen sobre relaciones paterno-filiales emitido por el Tribunal Superior de Puerto Rico. Fuimos informados mediante los susodichos escritos de 25 y 26 de noviembre que el licenciado Montañez Avilés, abogado de la recurrida, había presentado solicitud de renuncia a la representación legal y que el tribunal a quo la había aceptado. Mediante Resolución de 27 de noviembre de 1985 dispusimos: (1) dejar sin efecto la orden del Tribunal Superior que releva al licenciado Montañez Avilés de la representación legal de la demandada recurrida; (2) instruir a dicho foro que se abstuviese de hacer

pronunciamientos adicionales en el caso (particularmente en lo concerniente a renuncia de representación legal), y (3) conceder a los recurridos un plazo improrrogable a vencer el jueves 5 de diciembre de 1985 [3] para que compareciera a exponer su punto de vista sobre los diversos recursos presentados ante nos.

La parte recurrida compareció exponiendo su posición. Aunque de ordinario no intervenimos en esta etapa de los procedimientos, este litigio continúa multiplicándose rápidamente y nos preocupa que la incapacidad de las partes para resolver sus desavenencias tenga el efecto real de privar a un padre no custodio de poder establecer relaciones con su hija menor. Luego de estudiar cuidadosamente el extenso expediente de este caso y de examinar los autos, resolvemos los recursos planteados al amparo de la Regla 50 de este Tribunal.

## II

La controversia jurídica principal de este litigio tan complejo es de fundamental importancia en nuestro ordenamiento jurídico: ¿qué derechos tiene un padre no custodio a visitar y a mantener las relaciones familiares con sus hijos? ¿qué criterios debe utilizar un tribunal para definir y delimitar ese derecho?

Primeramente, reconocemos que las relaciones paterno-filiales constituyen una de las áreas más conflictivas en las relaciones familiares posteriores a un divorcio. Como consecuencia de un divorcio las personas se enfrentan a profundos problemas legales, económicos, sociales y familiares. Véase M. Muñoz Vázquez, *El significado social del divorcio y el sistema legal*, Centro de Investigaciones Sociales, U.P.R., 1984, pág. 60. Por la naturaleza de los problemas que surgen entre los padres muchos recurren con frecuencia a los tribunales

---

[3] Dicho plazo fue extendido hasta el 9 de diciembre de 1985 mediante Resolución del 2 de diciembre de 1985.

para resolver conflictos que requieren peritaje en conducta humana:

> Las relaciones paterno-filiales es un área muy sensitiva en la que entran en juego primordialmente el bienestar del menor y la sana relación de éste con ambos padres. Sin embargo, la experiencia en nuestros tribunales revela que con posterioridad al divorcio se crean serios problemas en la forma en que se llevan a cabo estas relaciones, tanto en divorcios contenciosos como en los divorcios por mutuo consentimiento. Esta es una de las situaciones, según expresiones de los jueces, que requiere mayor intervención del tribunal. *Apuntes sobre procedimientos judiciales en torno a la familia,* Secretariado de la Conferencia Judicial, diciembre 1984, pág. 148.

Cuando el tribunal le otorga la custodia a un padre y concede derecho de visita al otro, esto automáticamente tiene un efecto real sobre las relaciones del progenitor no custodio con el menor. El padre no custodio pierde cierta autoridad real sobre los hijos, que antes compartía con el ex cónyuge, desaparece la libertad de compartir y disfrutar con ellos en cualquier momento que desee. A medida que los patrones familiares han cambiado en nuestro país y los padres comparten más el cuidado de sus hijos y las tareas en el hogar, más profundo resulta el impacto de la separación para el progenitor no custodio como para los hijos.

Existen dos escuelas de pensamiento sobre las relaciones paterno-filiales. Una escuela sostiene que una vez se adjudica la custodia de un menor a uno de los padres, éste debe decidir si permite que el otro padre continúe relaciones con el hijo. Sostienen sus exponentes que de esta manera se reducen los conflictos de lealtades y los trastornos sicológicos. Véase J. Goldstein y A. Solnik, *Beyond the Best Interests of the Child,* New York, The Free Press, 1973.

La otra escuela endosa el contacto regular entre el padre no custodio y sus hijos. Este grupo entiende que las relaciones regulares entre el padre no custodio y sus hijos facilitan el

desarrollo personal de los niños y que los tribunales deben reconocer ese derecho y tomar las medidas pertinentes para protegerlo:

En consecuencia, salvo razones poderosas al contrario, debe reconocerse y fomentarse el derecho del no-custodio a visitar a sus hijos menores. No debe ignorarse el hecho de que la incapacidad para ejercer la custodia no incapacita necesariamente para el ejercicio del derecho a visitar los hijos menores y que los mejores intereses de los niños requieren que se proteja el ejercicio de ese derecho. Después de todo, el no custodio puede advenir custodio, con el transcurso del tiempo y cambio en circunstancias. Por lo tanto, las relaciones paterno filiales adecuadamente cultivadas facilitarían esa transición entre custodios. E. González Tejera, *Bienestar del menor: señalamientos en torno a la patria potestad, custodia y adopción,* en *Cambios sociales y nuevos enfoques en el derecho de familia,* Centro de Investigaciones Sociales, U.P.R., 1984, págs. 1, 112.

En cuanto a la preferencia de los menores, estudios recientes revelan que ellos prefieren que el padre no custodio comparta regularmente con ellos, sin importar la cantidad de tiempo que les dediquen. La mayoría de los menores quieren aumentar el número de horas que pasan con el padre no custodio. M. E. Colón, C. Martínez y N. Torres, *Patrones de relaciones filiales y factores que facilitan u obstaculizan su implementación,* Oficina de Servicos Sociales, Centro Judicial de San Juan, 1984.

### III

■ Nuestro Código Civil, al regular los efectos del divorcio, establece, en lo pertinente, lo siguiente:

En todos los casos de divorcio los hijos menores serán puestos bajo el cuidado y la patria potestad del cónyuge que el Tribunal, en el ejercicio de su sana discreción, considere que los mejores intereses y bienestar del menor quedarán mejor servidos; *pero el otro cónyuge tendrá derecho a continuar las relaciones de familia con sus hijos, en la manera y*

*extensión que acuerde el Tribunal al dictar sentencia de divorcio, según los casos.* (Énfasis nuestro.) Art. 107 del Código Civil, según enmendado en 1976 (31 L.P.R.A. sec. 383).

■ Por su naturaleza, el derecho a relacionarse con los hijos "no puede ser renunciado de modo pleno y absoluto por su titular; tampoco es susceptible de prescripción por no uso, ni puede ser objeto de transacción o de compromiso; debe ser ejercitado personalmente por su titular, y no cabe delegación en un tercero". G. García Cantero, *En torno al derecho de visita,* en la obra escrita por diferentes autores, *El derecho de visita de los menores en las crisis matrimoniales: teoría y praxis,* 2da ed., Pamplona, Ed. Univ. Navarra, 1982, págs. 247, 249.

■ Este derecho es de naturaleza personal y familiar de contenido afectivo. Su finalidad no es otra que la de favorecer y facilitar las más amplias relaciones humanas entre familiares. Se refiere a aquel derecho que corresponde naturalmente al padre o a la madre para comunicarse y relacionarse con aquellos hijos que por resolución judicial han sido confiados a la custodia del otro cónyuge:

> . . . La asociación de los hijos con sus padres, al mismo tiempo que reconoce el derecho de éstos a disfrutar de su compañía, desarrolla en los niños el afecto de los autores de sus días y contribuye a formar sus corazones en un ambiente de fraternidad paternal. . . . No hay vínculo en la vida que pueda considerarse más sublime que aquél que nace de la relación natural de afecto y simpatía que normalmente se desarrolla entre padre e hijo, no importa cuál pueda ser la conducta moral o la raza, color, credo o posición en la vida, del padre o de la madre. *Picó* v. *Mejía,* 52 D.P.R. 728, 731 (1938).

■ El derecho a mantener relaciones con sus hijos es tan importante que los tribunales pueden regular las relaciones paterno-filiales, pero no pueden prohibirlas totalmente, a menos que existan causas muy graves para hacerlo. Un ex cónyuge culpable, incluso por la causal de adulterio, no puede ser

privado de ver a sus hijos. Véanse *Picó* v. *Mejía*, supra; *Colorado* v. *Capella*, 18 D.P.R. 991 (1912); *Gorbea* v. *Látimer*, 34 D.P.R. 204 (1925). El derecho a las relaciones paterno-filiales debe entenderse lo más liberalmente posible sin escatimar el tiempo que el niño pueda estar con el progenitor que no lo tenga en custodia. *Centeno Alicea* v. *Ortiz*, 105 D.P.R. 523, 527 (1977). En otras jurisdicciones también se favorece la concesión liberal de este derecho. Por ejemplo, en España y Francia se dispone que el padre y la madre, aunque no ejerzan la patria potestad, tienen derecho a relacionarse con sus hijos menores, que incluye la comunicación regular con ellos y la facultad de tenerlos en su compañía. Véanse Código Civil de España, Arts. 94 y 161; Código Civil de Francia, Art. 288; C. M. Entrena Klett, *Matrimonio, separación y divorcio*, 2da ed., Pamplona, Ed. Aranzadi, 1984; *El derecho de visita: teoría y praxis, op. cit.* Por su parte, en el estado de California, se reconoce con carácter de política pública la importancia de asegurar que los hijos menores tengan contactos continuos y frecuentes con ambos padres después del divorcio o la separación. *Cal. Civ. Code* Sec. 4600–4601 (West 1983).

■ El derecho del padre o madre no custodio a relacionarse con sus hijos menores tiene la naturaleza de un derecho-deber de su titular, ya que está pensado y concebido no sólo para su propio beneficio, sino eminentemente en beneficio del menor. Durante la custodia física temporera en que el padre no custodio tiene al menor en su compañía, éste tiene deberes implícitos al ejercicio de su derecho: el de alimentarlo, dispensarle una acogida cálida y trato afectuoso, cuidarlo con la diligencia adecuada y velar por su salud física y psíquica. F. Rivero Hernández, *El derecho de visita: ensayo de construcción unitaria*, en *El derecho de visita: teoría y práxis, op. cit.*, págs. 96–97.

■ Las relaciones paterno-filiales adecuadamente reguladas fortalecen los vínculos afectivos que aseguran los cimien-

tos del compromiso que debe tener un padre de asistir a sus hijos en su desarrollo: "el derecho del padre a la compañía del hijo, aunque sea esporádica, no es mera derivación del bienestar del niño, sino parte también de derechos fundamentales que nacen de la paternidad, de nociones de libertad y justicia que una sociedad sujeta a limitaciones constitucionales no puede ignorar del todo". González Tejera, *op. cit.*, pág. 112.

█ La ley no puede establecer un tipo normativo del contenido de la visita y la relación entre padres e hijos. De la propia naturaleza y finalidad de este derecho se desprende que lo ideal es que sean los propios padres quienes se pongan de acuerdo sobre la forma, las circunstancias y extensión de las relaciones entre el progenitor no custodio y sus hijos. Razones de prudencia y conveniencia aconsejan que se tomen las medidas necesarias para facilitar un acuerdo entre los cónyuges. Sólo en los casos en que ese acuerdo no se consiga o sea perjudicial al interés de los menores, deberán los tribunales regular la modalidad de su ejercicio.

█ Un plan para reglamentar las relaciones paterno-filiales puede adoptarse como parte de la sentencia de divorcio. (4) Véase Colón, Martínez y Torres, *op. cit.*, págs. 165–166. Los abogados deben promover que las partes en un divorcio se pongan de acuerdo sobre las relaciones paterno-filiales y de esta manera se reducirían los inconvenientes y los conflictos que surgen al romperse el vínculo matrimonial. (5)

---

(4) En *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250, 277 (1978), al reconocer el divorcio por consentimiento mutuo expresamos que:

". . . [N]o se aceptará petición alguna de divorcio bajo los principios enunciados sin que las partes adjunten las estipulaciones correspondientes sobre la división de sus bienes, el sustento de las partes y otras consecuencias del divorcio."

(5) Invitamos a las partes, a los abogados, a los jueces y demás protagonistas de estos procesos a que exploren la alternativa de que dentro de la propia estipulación sobre relaciones paterno-filiales, custodia y derecho de visitas se disponga de métodos alternos de resolución de disputas de forma tal que profesionales en esta área tengan la oportunidad de contribuir a la

Los tribunales, conscientes de su responsabilidad de velar por el bienestar de los menores y la protección de sus mejores intereses, cuando las partes no se pongan de acuerdo, o la estipulación alcanzada no beneficie al menor, determinarán la manera en que los progenitores continuarán las relaciones de familia con sus hijos después de la disolución del matrimonio, Art. 107 del Código Civil, 31 L.P.R.A. sec. 383; *Santana Medrano* v. *Acevedo Osorio*, 116 D.P.R. 298 (1985); *Perron* v. *Corretjer*, 113 D.P.R. 593, 604 (1982); *Centeno Alicea* v. *Ortiz*, supra, pág. 527; *Nudelman* v. *Ferrer Bolívar*, 107 D.P.R. 495, 511–512 (1978); *Marrero Reyes* v. *García Ramírez*, 105 D.P.R. 90, 104 (1976).

■■ Al decidir el caso el tribunal deberá considerar todos los factores que tenga a su alcance para lograr la solución más justa. *Marrero Reyes* v. *García Ramírez*, supra, págs. 105–106. En lo posible, deberá considerar la opinión de los hijos y tendrá en cuenta que existe evidencia considerable que establece que la estabilidad emocional de éstos está íntimamente relacionada con la calidad de las relaciones que continúen teniendo con su padre o madre no custodio. Véase *Franz* v. *United States*, 707 F.2d 582, 601 (1983) y fuentes allí citadas.

■■ Al dictar normas para regular los derechos de visita, el tribunal deberá asegurarse de que el padre no custodio pueda tener la compañía de su hijo fuera del ámbito del

---

solución de estas disputas sin la necesidad de intervención judicial. Véanse J. A. Morales, *La resolución integral de disputas: redefinición de la tarea judicial*, 88–89 Rev. Der. Puertorriqueño 77 (1983–1984); J. A. Morales, *La mediación de disputas familiares: redescubrimiento de viejas axiologías*, en *Taller interdisciplinario de relaciones de familia y menores*, Oficina de Administración de los Tribunales, 1984; *Apuntes sobre procedimientos judiciales en torno a la familia*, Secretariado de la Conferencia Judicial, 1984, págs. 1, 86–103; *Alternative Means of Family Dispute Resolution*, American Bar Association, 1982; D. T. Saposnek, *Mediating Child Custody Disputes*, San Francisco, Ed. Jossey-Bass Pubs., 1983. Esto sin menoscabo del derecho que tienen las partes de acudir a los tribunales y del deber como *parens patria* que tienen éstos de velar por el bienestar de los menores.

otro progenitor por cierto tiempo que, dependiendo de las circunstancias, podría ser desde unas horas hasta varios meses. El derecho a tener a los hijos en su compañía incluye, salvo circunstancias excepcionales, la facultad de trasladar al menor a su casa o al lugar donde resida temporalmente. Se debe permitir que el derecho a tener la compañía temporera del menor se ejercite de la manera más amplia y razonable posible, de acuerdo con las circunstancias y el bienestar del menor. Esto tiene el propósito de asegurar el derecho fundamental del padre o madre no custodio a la privacidad e intimidad en las relaciones familiares con sus hijos:

> Hoy es prácticamente indiferente el lugar de la visita (que puede ser incluso en casa de un tercero), estimándose como norma habitual que el visitador puede prohibir la presencia de testigos, incluido el padre o madre titular de la patria potestad, a menos que venga impuesta por el Juez o sea necesaria por razones especiales (edad o enfermedad del menor, que puede precisar de atenciones ineludibles . . .). Rivero Hernández, *op. cit.*, pág. 99.

Al establecer el plan, el tribunal deberá tomar en consideración que el derecho del progenitor no custodio no debe interferir irrazonablemente con el del otro padre a tener una vida privada en la tranquilidad de su hogar. Al hacer el delicado balance de intereses, el tribunal debe inclinar la balanza del lado del bienestar del menor. Aparte de esto, no se debe permitir que cualquiera de los padres aproveche la custodia temporera para ejercer presión sobre el otro o manipular a los hijos para lograr ciertas ventajas u obtener la custodia sin previa determinación judicial. El tribunal podrá tomar medidas protectoras prudentes y razonables para conservar su jurisdicción sobre las partes y la controversia.

## IV

Concluido el análisis doctrinal pertinente, nos corresponde ahora considerar los múltiples recursos presentados por el pe-

ticionario y que están pendientes para su disposición final al amparo de la Regla 50 de este Tribunal.

A

De los hechos se desprende que las partes en este caso se divorciaron en el 1983 mediante una sentencia de un tribunal en Alemania Occidental. La sentencia incorporó una extensa estipulación que incluía, entre otras cosas, la regulación de las relaciones paterno-filiales entre el peticionario y su hija. [6] El acuerdo firmado entre las partes ante un notario público y adoptado en la sentencia es un requisito indispensable del procedimiento de divorcio por consentimiento mutuo según lo dispone la ley alemana luego de la reforma del derecho de familia de 1976 que reincorporó los artículos sobre el divorcio al Código Civil alemán. Véanse Código Civil alemán, Secs. 1564–1568, *Bürgerliches Gesetzbuch* (BGB) ; M. A. Glendon, *State, Law and Family: Family Law in Transition in the United States and Western Europe*, New York, North-Holland Pub. Co., 1977, págs. 214–222; D. Dumusc, *Le Divorce par Consentement Mutuel dans les Législations Européennes*, Genève, Librairie Droz, 1980, págs. 154–185; L. Muñiz-Argüelles, *Reflexiones en torno a las alternativas de reforma a la Ley de Divorcio*, XIV Rev. Jur. U. I. 107, 146 (1979).

■ Transcurridos más de dos años sin que el peticionario pudiera realmente ver a su hija, radicó una acción para establecer las relaciones paterno-filiales. Aunque el peticionario pudo haber iniciado un procedimiento de exequátur para hacer valer la sentencia de Alemania, *Ef. Litográficos* v. *Nat. Paper & Type Co.*, 112 D.P.R. 389 (1982), decidió radicar una acción ordinaria para establecer relaciones paterno-filiales. [7]

---

[6] Véase escolio 1, *ante.*

[7] Las diferencias no son meramente procesales. En *Ef. Litográficos* v. *Nat. Paper & Type Co.*, 112 D.P.R. 389, 396–397 (1982), enumeramos las justificaciones que modernamente se esbozan para reconocerle validez a las sentencias extranjeras mediante el procedimiento de exequátur. Mediante

El hecho de tramitar este caso como un pleito ordinario de relaciones paterno-filiales tuvo como consecuencia que las partes acordaran modificar en parte el acuerdo suscrito en Alemania mediante la estipulación del 7 de mayo de 1985. Este nuevo acuerdo también reguló el modo y la frecuencia con que el señor Sterzinger vería a su hija. Los párrafos pertinentes de la estipulación del 7 de mayo de 1985 son los siguientes:

1. El demandante vendrá a Puerto Rico por lo menos dos (2) veces con el fin de relacionarse con su hija Sybil, durante el período incluído entre junio y diciembre de 1985. El demandante notificará a la demandada sobre su viaje a Puerto Rico no menos de quince (15) días antes de su llegada a esta Isla.

2. Mientras se estén relacionando la niña y el demandante podrán ir a lugares tales como parques, la playa, sitios de recreo y la residencia del Lcdo. Alberto Esteves, de 9:00 de la mañana a 6:00 de la tarde los sábados, domingos y días festivos; y de 4:00 de la tarde a 7:00 de la noche en día de escuelas. El padre informará el sitio a donde va a llevar a la

este procedimiento los tribunales de Puerto Rico pueden reconocer la validez de una sentencia y ponerla en vigor si cumple con los requisitos esbozados en *Ef. Litográficos* v. *Nat. Paper & Type Co.*, supra, págs. 401–404. Véanse P. M. Hoff, J. Schulman y otros, *Interstate Child Custody Disputes and Parental Kidnapping: Policy, Practice and Law*, 2da ed., Chicago, National Clearinghouse for Legal Services, 1983, cap. 10, pág. 10-1; E. F. Scoles y P. Hay, *Conflict of Laws*, St. Paul, Minn., West Pub. Co., 1984, págs. 532–534.

Este caso es un buen ejemplo de la deseabilidad de utilizar el exequátur para evitar la duplicidad y la multiplicidad de esfuerzos e incidentes legales que atrasan la solución final para un padre que reclama su derecho a ver a su hija menor. El decreto del divorcio del tribunal de Alemania Occidental incluye disposiciones sobre el modo, la frecuencia y las circunstancias en que el señor Sterzinger ejercería su derecho a continuar relaciones familiares con su hija. El acuerdo suscrito por ambas partes reconoció que al momento de decretarse el divorcio la niña residía en Puerto Rico y proveyó para que el padre pudiese ver a la menor durante todo el año. No era necesario volver a litigar todo este asunto. Lo único que había que hacer era determinar si se reconocía la sentencia del Tribunal de Alemania Occidental y si se ponían en vigor sus disposiciones para hacer valer el derecho de visita del señor Sterzinger, *Ef. Litográficos* v. *Nat. Paper & Type Co.*, supra.

niña, sin perjuicio de que sus planes sean alterados por causas imprevistas.

. . . . . . . .

4. La niña viajará a Alemania en las Navidades de 1985 con su señora madre, quien la entregará al demandante el día 17 de diciembre de 1985 a las 10:00 de la mañana en el hotel donde ella, la madre, se hospede. La niña permanecerá con el padre en Alemania donde se relacionará con él y sus familiares hasta el día 2 de enero de 1986, fecha en que el padre devolverá la niña a su madre en el lugar de hospedaje de esta última en Frankfort.

La estipulación también proveyó para que el padre viese a la hija entre enero y junio de 1986, y para que la niña fuese a visitarlo a Alemania durante el verano.

■ Acordada por las partes una regulación de las relaciones paterno-filiales, corresponde al tribunal determinar si los términos favorecen los mejores intereses del menor. También tiene que examinar si la estipulación permite que el progenitor no custodio comparta liberalmente con su hijo de una manera que no intervenga irrazonablemente con la vida en el hogar del otro padre. El criterio rector al estudiar la estipulación tiene que ser de razonabilidad, tanto en la forma como en las circunstancias y la extensión de las relaciones paterno-filiales. Antes de la aprobación de una estipulación, el tribunal tiene que verificar que el acuerdo refleje fielmente el deseo y la voluntad de las partes y que éste cumpla con las normas pautadas anteriormente.

El tribunal de instancia examinó la estipulación y la aprobó mediante una sentencia emitida el 13 de mayo de 1985, en la cual reafirmó su jurisdicción "sobre cualquier asunto relacionado con las relaciones paterno-filiales y con los viajes de la menor a la República de Alemania".

■ Aunque lo más conveniente es que el tribunal celebre una vista antes de aprobar una estipulación, las circunstancias especiales de este caso, donde existía un acuerdo previo y

se habían celebrado varias vistas ante el juez, le permitieron al magistrado conocer cabalmente los intereses en conflicto. El juez tuvo oportunidad de familiarizarse con las posiciones de ambas partes y pudo llegar a una determinación juiciosa sobre la estipulación. La sentencia del tribunal a quo cumple con las normas rectoras que deben utilizarse en la determinación de las relaciones paterno-filiales.

El efecto real de esta segunda estipulación fue el de enmendar y complementar las disposiciones del acuerdo suscrito en Alemania, sólo en cuanto a derecho de visitas durante el 1985 hasta el verano del 1986. Sin embargo, la segunda estipulación no modifica ninguna de las otras partes del acuerdo firmado en Alemania y, por lo tanto, sus disposiciones sobre el derecho de visita, en cuanto no sean incompatibles con la sentencia del tribunal a quo, constituyen la ley entre las partes. El contenido de la sentencia de Alemania, en lo concerniente a derecho de visitas, no contraviene la política pública puertorriqueña y es cónsona con lo aquí dispuesto sobre las normas rectoras que se han de seguir al establecerse relaciones paterno-filiales.

### B

El peticionario también ha solicitado que nombremos un comisionado especial para resolver la controversia existente entre las partes. Se trata de un planteamiento inmeritorio. Actualmente existe una estipulación y sentencia que adjudica sus derechos y pone fin a la controversia. El incidente que motivó la moción fue por un desacuerdo en cuanto a las fechas en que el peticionario debía realizar su derecho de visita para relacionarse con su hija.

La Regla 41.2 de Procedimiento Civil declara que la encomienda de un asunto a un comisionado en el Tribunal de Primera Instancia será la excepción y no la regla. No se encomendará el caso a un comisionado en ningún pleito, salvo cuando estuvieren envueltas cuestiones sumamente técnicas o

de un conocimiento pericial altamente especializado. Esta regla tiene el propósito de preservar la integridad del Poder Judicial; la delegación de facultades de juzgador implícita en la designación de un comisionado ha de justificarse a plenitud como solución a situaciones extremas. *Vélez Ruiz* v. *E.L.A.*, 111 D.P.R. 752, 756–757 (1981); *Cestero* v. *Pérez de Jesús*, 104 D.P.R. 891 (1976). Aquí existe una estipulación que puso fin a la controversia entre las partes. El incidente ocurrido se debió a un desacuerdo sobre las fechas en que el peticionario podría ejercer su derecho, asunto que resolvió el juez de instancia al disponer mediante resolución de 4 de septiembre de 1985, que el peticionario tomara conocimiento de las fechas en que la menor Sybil iba a estar fuera de Puerto Rico, según lo ·notificado por la parte demandada, a los fines de que pudiera coordinar sus visitas a la menor en Puerto Rico.

■ Los otros planteamientos del peticionario son para revisar resoluciones dictadas por el juez de instancia con posterioridad a la sentencia y están basadas en argumentos de derecho. No se dan aquí las circunstancias extremas y extraordinarias que permitirían que se nombrase un comisionado especial. Sólo se trata de la interpretación de una estipulación que adjudica los derechos de las partes, asuntos comunes a cualquier litigio celebrado diariamente ante nuestros tribunales de justicia.

## C

El peticionario recurrió ante este Tribunal para solicitar que encontráramos incursa en desacato a la demandada por llevarse de viaje a la niña Sybil en varias ocasiones durante el·litigio. Alega que al viajar con la niña violó nuestras resoluciones del 14 de febrero y del 20 de marzo del año 1985. En la resolución de marzo impartimos instrucciones específicas al juez de instancia de que "tomara medidas específicas para que la niña Sybil sea mantenida físicamente dentro de su jurisdicción hasta que otra cosa se disponga por disposición final y

firme". En ambas ocasiones nuestras instrucciones fueron a los efectos de asegurar que ni el padre ni la madre removieran a la menor fuera de la jurisdicción de nuestros tribunales.

De los autos se desprende que, tanto mediante la sentencia del 13 de mayo de 1985 y la resolución de 4 de septiembre de 1985, el tribunal de instancia tomó las medidas pertinentes para que la niña fuese mantenida físicamente en Puerto Rico. La estipulación del 7 de mayo de 1985 contiene medidas específicas sobre los viajes de la menor a Alemania y le requiere al peticionario que deposite su pasaporte bajo la custodia del tribunal cuando viaje a Puerto Rico para visitar a su hija. [8]

En 9 de octubre el tribunal a quo a petición de la licenciada Candelario, autorizó que la menor viajara a Florida en determinadas fechas. El 15 de octubre el tribunal de instancia dejó en suspenso su determinación de 9 de octubre de 1985.

Las medidas descritas anteriormente tuvieron el efecto de disponer de los incidentes que ocurrieron previo a la estipulación y que motivaron las mociones de desacato radicadas por el peticionario.

Por medio de mociones de 25 y 26 de noviembre de 1985 presentadas por el peticionario, fuimos informados que la madre de la menor y la menor se han trasladado al estado de Florida con la aparente intención de establecer domicilio en dicho estado. En su contestación a la orden de mostrar causa la parte recurrida confirmó que se había mudado al estado de Florida. En su comparecencia también nos informa que ha presentado un escrito ante los tribunales de Florida para que estos pongan en vigor las determinaciones de custodia hechas por Puerto Rico en el presente caso.

---

[8] El tribunal a quo el 4 de septiembre también le ordenó que se le enviara copia de la resolución a las líneas aéreas y a otras entidades para notificarle las limitaciones impuestas al peticionario en sus regresos a Puerto Rico. De los autos no se desprende que estas medidas fueran justificadas, y claramente exceden los criterios de razonabilidad que deben orientar las medidas protectoras de un tribunal.

Aunque no se ha cuestionado directamente la jurisdicción de este Tribunal para dictar el fallo que hoy emitimos o para que el tribunal a quo continúe con los procedimientos iniciados, motu proprio resolvemos que en esta etapa de los procesos son los tribunales de Puerto Rico los que tienen jurisdicción sobre la presente controversia.

Fue precisamente para enfrentarse a este tipo de situación que el Congreso Federal aprobó el *Parental Kidnapping Prevention Act* (PKPA), 28 U.S.C. sec. 1738A. Este estatuto aplica tanto a Puerto Rico como al estado de Florida, 28 U.S.C. sec. 1738A(b)(8). *Perron* v. *Corretjer*, supra, pág. 601. No hay duda de que Puerto Rico es y sigue siendo el "estado residencia" (*home-state*) según lo dispuesto por la ley federal. Por tal razón, las determinaciones que hasta ahora han hecho las cortes de Puerto Rico deben ser respetadas por las otras jurisdicciones. Entre las determinaciones que realizaron los tribunales de Puerto Rico se dispuso que la menor en el presente caso no podía salir de la jurisdicción de Puerto Rico sin previa autorización judicial. Mediante la resolución del 4 de septiembre el tribunal a quo específicamente ordenó que la parte recurrida tenía que obtener autorización específica del magistrado antes de poder viajar fuera del país.[9] Sería una burla tanto a los Tribunales de Puerto Rico como a los propósitos de la PKPA si se resolviese que al sacar a la niña de la jurisdicción del "estado residencia" en abierta violación a las órdenes dictadas por ese foro, éste automáticamente pierde la jurisdicción. Además, dudamos mucho que el estado de Florida tenga jurisdicción en el presente caso. La propia ley federal exige que para poder ser el "estado residencia" el menor tiene que haber residido en dicho

---

[9] En la resolución del 4 de septiembre de 1985 el juez de instancia dispuso que "[e]n la eventualidad de que la menor, fuera de las fechas antes relacionadas, tuviera que ausentarse de Puerto Rico, únicamente podrá hacerlo previa autorización por parte de este Tribunal con notificación a la parte peticionaria".

estado por lo menos seis (6) meses consecutivos. 28 U.S.C. sec. 1738A(b)(4). Además el inciso (g) de la PKPA claramente dispone que un estado debe abstenerse de ejercer jurisdicción si otro ya ha comenzado a ejercerla de forma cónsona con los postulados del estatuto. Véase P. M. Hoff, J. Schulman y otros, *Interstate Child Custody Disputes and Parental Kidnapping: Policy, Practice and Law*, 2da ed., Chicago, National Clearinghouse for Legal Services, 1983, pág. 3-38.

Por tales razones, se le ordena a la recurrida que inmediatamente, so pena de desacato, regrese a la menor Sybil Sterzinger Candelario a la jurisdicción de Puerto Rico, y que la niña esté disponible para ser visitada por su padre aquí en Puerto Rico. Se le recuerda a la recurrida que, según lo dispuesto por la sentencia del 13 de mayo de 1985, la menor viajará a Alemania y le será entregada a su padre para que pase las navidades del 1985 con él.

El tribunal de instancia debe celebrar a la mayor brevedad posible una vista para determinar si la licenciada Candelario o terceras personas han incurrido en desacato criminal por desobedecer cualesquiera de las órdenes, resoluciones y sentencias, particularmente el dictamen del tribunal a quo del 4 de septiembre de 1985 que prohíbe que se remueva a la niña de la jurisdicción de Puerto Rico sin previa autorización judicial. El tribunal debe celebrar una vista de acuerdo con la Regla 242 de Procedimiento Criminal y determinar si la parte recurrida violó el Art. 235(b) del Código Penal, 33 L.P.R.A. sec. 4431(b).

■ Reiteramos el poder inherente de los tribunales para vindicar la majestad de la ley y para hacer efectiva su jurisdicción y pronunciamientos. La Asamblea Legislativa al aprobar el Art. 235 del Código Penal fortaleció el poder de los tribunales para vindicar su autoridad al penalizar la desobediencia a "cualquier decreto, mandamiento, citación u otra orden legal expedida o dictada por algún tribunal en un pleito o proceso en que estuviere conociendo".

## D

El 24 de abril de 1985 la recurrida presentó en el tribunal de instancia una reconvención en la cual solicitaba que se aumentara el monto de la pensión alimenticia que el peticionario estaba obligado a pasarle mensualmente a su hija Sybil en virtud de la sentencia de divorcio dictada en Alemania. El peticionario se opuso a dicha reclamación y alega que los tribunales de Puerto Rico no tenían jurisdicción sobre su persona para adjudicar dicha reclamación por estar él domiciliado en Alemania. El tribunal a quo, sin celebrar vista, concluyó que sí existía jurisdicción sobre la persona. El peticionario recurre ante nos y cuestiona dicha determinación. Concluimos que el tribunal de instancia actuó correctamente al determinar que existía jurisdicción sobre la persona.

Señala el peticionario que erró el juez de instancia al no ordenar la celebración de vista para determinar si había jurisdicción *in personam* conforme a nuestra opinión en *Ind. Siderúrgica* v. *Thyssen Steel Caribbean*, 114 D.P.R. 548 (1983). En ese caso resolvimos que había cometido error el tribunal de instancia al declarar sin lugar la moción de desestimación presentada por la demandada sin celebrar vista y que cuando menos debió requerir que el demandante demostrara que contaba con prueba suficiente para establecer los requisitos necesarios para conferir jurisdicción *in personam* sobre la demandada. Nuestra expresión se debió a que existía una controversia de hechos sobre si la demandada había realizado o no transacciones de negocios en Puerto Rico y resolvimos que debió permitírsele presentar evidencia para probar su alegación. En este caso no era necesaria la celebración de vista por no existir controversia sobre los hechos que se alegan confieren jurisdicción al tribunal. Esto surge del propio conocimiento del juez, que ha intervenido en el caso y del expediente del mismo.

La primera excepción a la norma de que los estados no tienen jurisdicción sobre un no domiciliado es cuando ha habido sumisión expresa o tácita. Desde 1938 el Tribunal Supremo de Estados Unidos en *Adam* v. *Saenger*, 303 U.S. 59 (1938) ha sostenido que un demandante que acude a los tribunales de un estado del cual no es domiciliado, no puede alegar que no hay jurisdicción sobre su persona para adjudicar una reconvención instada contra él en el mismo pleito. Dijo el Tribunal en *Adam* v. *Saenger*, supra, págs. 67–68:

> The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence. *It is the price which the state may exact as the condition of opening its courts to the plaintiff.* (Énfasis suplido.)

Esta norma fue reafirmada recientemente en *Insurance Corp.* v. *Compagnie Des Bauxites*, 456 U.S. 694, 704 (1982), donde el Tribunal Supremo federal esboza claramente las distinciones entre falta de jurisdicción sobre la materia y falta de jurisdicción sobre la persona, entre las que se encuentra el hecho de que la segunda puede ser renunciada tácita o implícitamente. Íd., págs. 702–703. En el presente caso no debe haber duda de que una vez el peticionario presentó su acción en nuestras cortes para que se establecieran relaciones paterno-filiales se sometió a la jurisdicción de nuestros tribunales para ajudicar cualquier reclamación que tuviera la parte demandada contra él. Véase J. A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, Ed. J.T.S., 1983, págs. 13–14.

Una vez resuelto que existe jurisdicción *in personam* sobre el peticionario, los "tribunales debemos sopesar diversos factores para determinar si, aun gozando de jurisdicción, debemos abstenernos de ejercerla". *Marrero Reyes* v. *García Ramírez*, supra, pág. 100. En este caso están presentes

factores suficientes que hacen adecuado y conveniente el ejercicio de jurisdicción: (a) la menor está domiciliada y reside en Puerto Rico; (b) el peticionario ha sido debidamente notificado y tiene representación legal contratada en Puerto Rico; (c) se trata de un reclamo de pensión alimenticia por una hija menor de edad, el cual es de gran importancia para el bienestar de ésta, y cuyo cumplimiento es asegurable y exigible por medio de nuestros tribunales. La tendencia de este Tribunal ha sido la de adoptar la norma más abarcadora posible para asumir jurisdicción en casos de familia, debido a la importancia de velar por el bienestar de los menores que están sujetos a nuestra jurisdicción. *Marrero Reyes* v. *García Ramírez*, supra; *Medina* v. *Tribunal Superior*, 104 D.P.R. 346 (1975).

Por lo tanto, resolvemos que el peticionario se sometió a la jurisdicción de los tribunales de Puerto Rico y que procede la consideración de la moción solicitando un aumento en la pensión alimenticia.

## V

No queremos concluir sin antes hacer un señalamiento sobre la profunda preocupación de este Tribunal sobre las consecuencias de este tipo de controversias sobre las partes y en especial sobre el menor. A largo plazo el más afectado es el menor y junto con él la sociedad en general. En *Centeno Alicea* v. *Ortiz*, supra, pág. 527, habíamos expresado lo siguiente:

En cuanto a los días y horas en que la madre puede tener consigo al niño, esto debe entenderse lo más liberalmente posible. No debe escatimarse el tiempo en que el niño esté con su madre si así lo desea. Estas situaciones no se curan con pleitos ni con órdenes de los tribunales. Se curan con cariño verdadero para con el niño, el cual es el cariño desinteresado; con respeto y tolerancia de una parte para con la otra; con el buen ejemplo; y creando un ambiente familiar de paz y de amor.

Invitamos a las partes en este litigio a que mediten profundamente sobre las consecuencias de este conflicto sobre su hija. Aunque las desavenencias entre ellos han marcado huellas imborrables en el camino de su vida, la menor Sybil tiene un derecho natural a crecer en un ambiente que le facilite su desarrollo personal y que no afecte adversamente su salud mental, en una etapa de su crecimiento en que apenas comienza a disfrutar y a apreciar las bellezas de la naturaleza y la majestuosidad de la vida. Nos corresponde a todos ayudarle y protegerle en su desarrollo y en su bienestar. Este conflicto entre sus progenitores por su cuidado y por su amor es la peor herencia que le pueden dejar para toda su vida.

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Ortiz no intervino.