# 2002 DTA 80

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL VII DE CAROLINA Y FAJARDO**

CARMEN LOPEZ COTTO
Demandante-Recurrida

v.

JAMES ALLEN RANLETT
Demandado-Peticionario

Núm. KLCE-01-01179

San Juan, Puerto Rico, a 21 de marzo de 2002

Panel integrado por su Presidente, el Juez Miranda de Hostos,
la Juez Hernández Torres y el Juez Martínez Torres

Martínez Torres, Juez Ponente

**TEXTO COMPLETO DE LA RESOLUCION**

El peticionario James Allen Ranlett solicita que revisemos un dictamen mediante el cual el Tribunal de Primera Instancia se declaró con jurisdicción sobre el menor hijo del demandado-peticionario, Ranlett, y la demandante-recurrida, Carmen López Cotto. Por los fundamentos que expondremos a continuación, se deniega la expedición del auto solicitado.

**I**

El 6 de octubre de 1999, la demandante-recurrida, Carmen López Cotto, radicó demanda sobre alimentos y relaciones paterno-filiales en el Tribunal de Primera Instancia, Sala Superior de Fajardo. Como parte de las

alegaciones de la demanda, López Cotto indicó que se encontraba separada de su esposo James Allen Ranlett, desde el mes de diciembre de 1998; que se encontraba viviendo en el Municipio de Vieques junto a su hijo, el menor Pablo Esteban Ranlett López y que desde que ella se mudó a Vieques con su hijo, el señor Ranlett no había hecho pago alguno por concepto de su obligación alimentaria para beneficio del hijo de ambos. Por esa razón, López Cotto solicitó del tribunal la fijación de una pensión alimentaria de acuerdo al procedimiento establecido en la Ley Especial de Sustento de Menores, Ley Núm. 5 de 30 de diciembre de 1986, según enmendada, 8 L.P.R. A. sec. 501 *et. seq.* Por último, López Cotto alegó que ambas partes no habían podido llegar a un acuerdo sobre las relaciones paterno-filiales con el menor y solicitó además que se le reconociera a ella la *"custodia de hecho"* sobre el niño. Ap. *Cert.*, pág. 2.

El demandado-peticionario, Ranlett, fue emplazado personalmente en Vieques, el 8 de octubre de 1999. Diecisiete días después de haber sido emplazado, es decir, el 25 de octubre de 1999, Ranlett presentó una demanda en la Corte Superior de California en la que solicitó que la custodia legal del menor fuera conjunta, que la custodia física del menor se le concediera a él y que el derecho de visitas se le concediera a la aquí recurrida, López Cotto.

El 4 de noviembre de 1999, Ranlett radicó su contestación a la demanda radicada en Puerto Rico e hizo constar que no se sometía a la jurisdicción del tribunal. Levantó como defensa afirmativa, entre otras, que el tribunal de Puerto Rico carece de jurisdicción sobre la materia conforme al Parental Kidnapping Prevention Act, 28 U.S.C. sec. 1738A. Alegó además que el Estado de California es el que tiene jurisdicción conforme a dicha ley.

El 5 de noviembre de 1999, la demandante-recurrida, López Cotto, radicó una moción urgente en solicitud de orden para que el menor Pablo Esteban no fuera trasladado a California sin previa autorización a esos efectos. Luego de la réplica radicada por el aquí peticionario, Ranlett, el tribunal dictó orden el 24 de noviembre de 1999, en la que prohibió el traslado del menor fuera de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, hasta que se celebrara una vista y se determinara sobre el asunto.

En esa misma fecha, es decir, el 24 de noviembre de 1999, la Corte Superior del Estado de California, Condado de Placer, dictó una orden titulada *"Order of Finding Jurisdiction and Request for Return of Minor Child (Hague Convention on Civil Aspects of International Civil Abduction)"*. En la orden, dicho tribunal concluyó que la residencia habitual del menor es los Estados Unidos conforme a la Convención de la Haya; y que el estado residencia del menor es California, conforme la *"Uniform Child Custody Jurisdiction Act"*, la *"Parental Kidnapping Prevention Act", supra,* y la *"Uniform Child Custody Jurisdiction and Enforcement Act"*. Concluyó además que el tribunal de California es el adecuado para determinar la custodia y las relaciones paterno filiales con el menor. Por último, el tribunal de California solicitó al tribunal de Puerto Rico que como asunto de respetuo mutuo, ordenara que el menor fuera devuelto al Condado de Placer en California. Dicho tribunal también indicó que estaba dispuesto a discutir el caso con el tribunal de Puerto Rico. El tribunal de Puerto Rico, sin embargo, declinó una posterior invitación del tribunal de California para discutir el aspecto jurisdiccional planteado en el caso.

No obstante la determinación del tribunal de California, el 8 de diciembre de 1999, el Tribunal de Primera Instancia de Puerto Rico dictó una resolución titulada *"sentencia"* en la que aprobó en su totalidad el informe rendido por la Examinadora de Pensiones Alimentarias el 15 de noviembre de 1999 En su informe, la examinadora indicó que no habían transcurrido seis (6) meses desde que el menor fue trasladado a Puerto Rico y que las partes previamente habían estipulado una pensión alimentaria de $790.00 mensuales.

Luego de los trámites relacionados al descubrimiento de prueba, la vista en su fondo se celebró el 28 de septiembre de 2000 en el Tribunal de Primera Instancia, Sala Superior de Fajardo, en Vieques, con el fin de determinar la jurisdicción sobre la materia. De acuerdo al expediente del caso, ambas partes estipularon treinta

(30) documentos y una serie de hechos. Véase, Ap. _Cert._, págs. 94-97.

A base de la prueba documental admitida, de la prueba estipulada y de la credibilidad que le merecieron los testigos presentados, el Tribunal de Primera Instancia (Hon. Angela L. De Jesús Collazo, Juez) hizo las siguientes determinaciones de hechos:

"*1. Pablo Esteban Ranlett López nació en California, E.U.A., el 24 de noviembre de 1996, hijo de las partes.*

*2. La demandante residió en el estado de California, de E.U.A., desde enero de 1985 participando allá de los procesos electorales [,] de transacciones de consumo y comerciales y de toda la gama de gestiones propias de una persona domiciliada en el lugar.*

*3. La demandante nació en Oklahoma, E.U.A., ya que su padre era militar. Su escuela elemental la cursó en Puerto Rico y la intermedia en Vieques, específicamente al mudarse sus padres a ese municipio.*

*4. En 1984, se graduó de escuela superior en Guaynabo y en el verano de ese mismo año fue violada y sus atacantes acusados en corte, lo que suscitó unas amenazas hacia su persona que la motivaron a dejar su país* ▮ *e irse a residir en California con su hermana.*

*5. Hizo estudios universitarios en varias universidades en California.*

*6. En 1985, vino para la época de verano, al igual que en 1986. Para 1987, vino en Navidades procurando pasar el mayor tiempo posible en Vieques, donde se sentía más segura.*

*7. Sus padres se mudaron a California, E.U.A. en 1987.*

*8. En 1987, la demandante conoció al demandado y estuvieron de novios por "par de años".*

*9. Ambos se casaron en 1989 y el [sic] siguiente año vinieron a Puerto Rico para que éste conociera el país de su esposa* ▮

*10. Nuevamente, regresaron al año siguiente (1990) con el propósito de conocer el resto de la familia de ella.*

*11. Así sucesivamente, pasaban el período de vacaciones de ambos en Puerto Rico durante diez años, exceptuando un año en que no viajaron.*

*12. En sus viajes alquilaban un auto para su uso personal.*

*13. En septiembre de 1998, la demandante le planteó a su esposo que deseaba tomar el examen de Puerto Rico para obtener la licencia de corredora de bienes raíces y quedarse a vivir en Puerto Rico, puesto que donde únicamente estaría autorizada a ejercer como corredora sería aquí de aprobar el examen. En su declaración, el demandado corrobora que ella le hizo la pregunta de si estaba de acuerdo con sus plantes [sic], ya que ésta no quería que después que pasara el examen, él no les permitiese a ella y al niño establecerse en Vieques.*

*14. Acordaron que todos vendrían en época navideña de 1998 para irse aclimatando acá, pero Nochebuena y Navidad las pasaron en California, a petición del demandado.*

*15. Vinieron el 28 de diciembre de 1998 y ella solicitó el examen en mayo de 1999 (Exhibit II por estipulación), pero no lo aprobó.*

16. El 21 de enero de 1999, la demandante adquirió un cheque oficial del Banco Popular para la adquisición de un carro. El monto del cheque oficial era de $4,500.00 (Exhibit 1 por estipulación).

17. La demandante se fue a residir a una casa que estaba desocupada, propiedad de un familiar, la cual requirió reparaciones debido a los daños sufridos por el azote del Huracán Hugo [sic]. Hubo que techarla, pintarla, reparar la cocina y una puerta.

18. Mientras el demandado estuvo en Vieques, en enero y febrero de 1999, ambos hicieron gestiones para una escuela para Pablo, el hijo de ambos. En la Escuela Episcopal lo dejaron incluido en una lista de espera.

19. El 2 de marzo de 1999, antes de salir hacia el aeropuerto, visitaron el centro donde estaría el niño y recibieron la lista de lo que hacía falta.

20. El demandado envió por fotocopiadora una copia del acta de nacimiento del niño para hacerla llegar a la escuela.

21. Como no aparecía la tarjeta de seguro social del niño, el demandado envió evidencia de haber solicitado un duplicado.

22. El demandado también obtuvo para su esposa las transcripciones de crédito que le requerían para gestionar otro examen (exhibit 29 por estipulación).

23. El demandado había enviado la computadora y la impresora por correo expreso y cuando éste llegó a Puerto Rico acudió a la casa de la tía de la demandante en Río Piedras, para recogerla, ya que no se podía enviar a Vieques por correo expreso.

24. También le envió, del mismo modo, y al mismo lugar, el cerebro de la computadora. (exhibit 31 por estipulación). Todo lo instaló él.

25. El 24 de noviembre de 1999, celebraron en Vieques, el cumpleaños de Pablo, papá, mamá y unos amiguitos (exhibit 12 por estipulación).

26. El demandado realizó gestiones en su empresa, encaminadas a indagar la posibilidad de que hubiera una plaza vacante disponible para él en Puerto Rico.

27. El demandado admitió en su testimonio que las gestiones que él llevó a cabo son las que normalmente realizaría una persona cuando busca trabajo.

28. Como parte de las relaciones paterno-filiales, el demandado tuvo consigo a Pablo por cuarenta y un días en 1999, distribuidos entre los meses de marzo, abril, junio y julio. El 28 de julio, el demandado viajó con su hijo trayéndolo de regreso a Puerto Rico.

29. Por motivo de ese acuerdo de relaciones paterno-filiales, Pablo no estuvo físicamente en Puerto Rico durante seis meses consecutivos previo a la presentación de esta acción.

30. La demandante dejó en California varias pertenencias de ella, así como cuentas de cheque compartidas con su esposo y una de ellas del negocio de ambos.

31. Al presente, la demandada no ha obtenido la licencia de bienes raíces y desde agosto de 1999 trabaja en el Fideicomiso de Conservación.

*32. La demandante hizo gestiones encaminadas a obtener su inclusión en Vieques, como electora de Puerto Rico, el 24 de mayo de 2000 (exhibit 13 por estipulación)."*

[Resolución págs. 2-5; Ap. *Cert.*, págs. 278-282.]

Como paso previo para emitir sus conclusiones de derecho, el Tribunal de Primera Instancia interpretó las disposiciones de la *"Parental Kidnapping Prevention Act"* (P.K.P.A.), *supra*, específicamente las referentes a lo que se considera *"estado residencia"* del menor, aspecto importante para determinar qué foro tiene jurisdicción sobre la controversia. A raíz de su interpretación, el tribunal concluyó lo siguiente en la resolución dictada el 28 de diciembre de 2000:

*"De la evidencia desfilada surge que el menor no estuvo seis meses consecutivos en Puerto Rico, antes de la presentación de la demanda, ni tampoco en California.*

*No albergamos dudas de que el viaje del niño fue acordado por ambos padres. Tampoco dudamos que la intención de mamá era quedarse con el niño, a residir en Puerto Rico y que ello era del conocimiento de papá. Más aún, surge de la prueba presentada que papá también consideró residir en Puerto Rico, pero no pudo materializarse un empleo adecuado para él. Su admisión de que las gestiones efectuadas por él son de las que normalmente se hacen cuando se está en búsqueda de un empleo son bastante elocuentes. (Véase la Determinación de Hechos # 27).*

*Lo que surge de los testimonios escuchados y de la documentación que forma parte de la prueba del caso, es que Pablo Esteban y su mamá vinieron a establecer su residencia en Vieques, Puerto Rico; que papá estuvo de acuerdo [sic] encaminadas a obtener un empleo en Puerto Rico y que, después de haber sido notificado oficialmente de que se estaba reclamando alimentos para el niño y la regulación de las relaciones paterno-filiales, [sic] que decidió entablar una acción legal en California aduciendo hechos contrarios a la verdad. (Véanse exhibits 18 al 24).*

*Determinamos, por este medio, que Puerto Rico es el lugar con jurisdicción sobre Pablo Esteban Ranlett López, por lo que es al Tribunal de Primera Instancia, Sala De Fajardo, al que le corresponde intervenir en las reclamaciones que se han instado para adjudicar las mismas conforme a derecho. No es el Estado de California, el que tiene la autoridad sobre el menor, sino Puerto Rico."*

[Resolución, págs. 7 y 8; Ap. *Cert.* págs. 283 y 284, énfasis suplido.]

Inconforme con la resolución dictada por el Tribunal de Primera Instancia, el aquí demandado-peticionario, Ranlett, radicó ante dicho foro una moción de reconsideración el 7 de febrero de 2001. El tribunal dictó una orden el 20 de febrero de 2001, en la que se determinó que la moción de reconsideración sería discutida en una vista a celebrarse el 26 de febrero de ese mismo año. El 22 de febrero de 2001, Ranlett presentó ante este Tribunal de Circuito de Apelaciones una solicitud de *certiorari*. El 9 de abril de 2001, en el caso KLCE-01-00209, desestimamos el recurso por prematuro, ya que el Tribunal de Primera Instancia había acogido la moción de reconsideración.

El 12 de julio de 2001, luego de una serie de trámites procesales, el Tribunal de Primera Instancia (Hon. Edison Sanabria Pérez, Juez) declaró sin lugar la moción de reconsideración presentada por el demandado-peticionario, Ranlett. De acuerdo a dicha resolución, el peticionario Ranlett alegó que la determinación de hechos número 28 era incorrecta, ya que el menor no estuvo 41 días en California con él, sino 80 días. Rectificó el tribunal e indicó que de las estipulaciones de las partes surgía que el menor estuvo con el peticionario durante 80 días durante los meses de marzo, abril, junio y julio. Señaló también el tribunal que el aquí peticionario, Ranlett, viajó con su hijo trayéndolo de regreso a Puerto Rico el 28 de julio de 1999. Ap. *Cert.*, pág. 363. El tribunal

encontró que el error en el cómputo no era razón para cambiar el dictamen anterior.

El peticionario Ranlett alega que los ochenta (80) días distribuidos entre los meses de marzo, abril, junio y julio de 1999 deben considerarse como ausencias temporeras que no interrumpen el término de seis meses provisto en la P.K.P.A., *supra*. En segundo lugar, alega que erró el tribunal al determinar que los períodos de tiempo en que estuvo el menor con él en California pueden considerarse como *"períodos de ausencia temporal"*, que pueden contarse como parte de los seis meses que requiere el antes mencionado estatuto.

Mediante Resolución de 10 de septiembre de 2001, acogimos el recurso como uno de *certiorari* porque se recurre de un dictamen respecto a la jurisdicción sobre el menor y no uno que adjudique la causa de acción de alimentos y relaciones filiales. El 19 de septiembre de 2001, dictamos nueva resolución en la que ordenamos a los abogados de las partes a reunirse con el fin de lograr la estipulación de la exposición narrativa de la prueba. El 2 de octubre de 2001, dictamos Resolución en la que autorizamos la regrabación de la vista oral para obtener una transcripción por taquígrafo privado, la cual debería ser presentada como exposición narrativa estipulada de la prueba. Finalmente la demandante-recurrida, López Cotto, radicó su alegato de réplica el 8 de febrero de 2002. Por su parte, el demandado-peticionario, Ranlett, radicó una breve moción de réplica el 13 de febrero de 2002.

Contando con la comparecencia de ambas partes y con la exposición narrativa estipulada de la prueba, resolvemos.

**II**

En el año 1968, la *"National Conference of Commissioners of Uniform State Laws"* promulgó la ley conocida como *"Uniform Child Custody Jurisdiction Act"* (U.C.C.J.A). Esta ley se promulgó a raíz de la preocupación generada por el hecho de que miles de niños eran removidos de estado en estado, mientras sus padres se disputaban la custodia de ellos en diferentes tribunales estatales. Manuel E. Moraza Choizne, *Judidicial Solutions in the U.S.A. for Parental Kidnapping in Child Custody Cases*. 24 Rev. Jur. U.I.P.R., Núm. 2, pág. 312 (1990). La U.C.C.J.A. tenía como propósito principal limitar el número de tribunales potenciales con jurisdicción sobre disputas relacionadas con la custodia de menores y requerir a otros tribunales con jurisdicción que dieran deferencia a órdenes de custodia dictadas válidamente en otros tribunales. Véase, Andrea Lockhart, *California's Answer to the Problem of Parental Kidnapping*. 11 J. Contemp. Legal Issues 538, 540 (2000). Sin embargo, la U.C.C.J.A. no fue la solución al problema imperante, ya que muy pocos estados la adoptaron, manteniéndose así la falta de uniformidad en el asunto jurisdiccional.

Ante la solución antes descrita, el Congreso de los Estados Unidos aprobó el 28 de diciembre de 1980, la ley conocida como *"Parental Kidnapping Prevention Act of 1980"* (P.K.P.A.). Es el primer estatuto federal dirigido a enfrentar el problema de remoción interestatal de menores por sus padres o parientes y rige expresamente en todos los estados de la Unión, en el Distrito de Columbia, en Puerto Rico, y en los demás territorios y posesiones de los Estados Unidos. 28 U.S.C.A. sec. 1738A. Véase además, Guanina Pérez Pérez, *Parental Kidnapping Prevention Act y su Aplicación en Puerto Rico,* 21 Rev. Jur. U.I.P.R. 470 (1987).

En *Perrón v. Corretjer*, 113 D.P.R. 593, 601 (1982), el Tribunal Supremo expresó que el P.K.P.A. aspira a establecer un sistema nacional de interpretación judicial con los siguientes propósitos: (1) localizar padres con hijos menores que se trasladan de una jurisdicción a otra en disputas conyugales; (2) promover la cooperación entre los distintos tribunales estatales para que las determinaciones de custodia y visitas sean dictaminadas por aquel estado que pueda resolver el caso más satisfactoriamente para el bienestar de los menores; (3) estimular y ampliar el intercambio de información y asistencia recíproca entre estados; (4) facilitar la ejecución de tales decretos judiciales; (5) desanimar la continuidad de controversias interestatales sobre custodia de menores en abono de una mayor estabilidad en el ambiente familiar y en la relación con los menores; (6) evitar conflictos jurisdiccionales entre estados sobre la materia, y (7) frenar los secuestros interestatales o la remoción unilateral de los menores con el propósito de obtener y afianzar decretos favorables de custodia.

La Sección 1738A, subsección (c) de la P.K.P.A., *supra*, establece los requisitos exigidos para que un estado pueda dictar válidamente un decreto sobre custodia. De acuerdo a esta subsección, el estado tiene que tener jurisdicción para emitir el decreto al amparo de su propia legislación, y tiene, además, que cumplir con **una** de cinco condiciones adicionales establecidas. Las cinco condiciones son:

"A. *(i) ese es el Estado-residencia del menor a la fecha en que se inician los procedimientos, o*

*(ii) fue su Estado-residencia con seis meses de antelación a la fecha en que se iniciaron los procedimientos y el menor está ausente debido a que ha sido trasladado o retenido por uno de los padres litigantes, o por otra razón, y el promovente permanece en ese estado;*

*B. (i) surge que ningún otro estado tiene jurisdicción a base de las circunstancias, y*

*(ii) para el mejor bienestar del menor, el tribunal de dicho estado asume jurisdicción debido a que: (1) el menor y sus padres, o aquél y uno de los litigantes tiene un contacto significativo con el Estado, más allá de la mera presencia física en el mismo; y (2) existe y está disponible en ese estado evidencia sustancial relativa al cuidado, protección, entrenamiento, y relaciones personales presentes y futuras del menor;*

*C. el menor está físicamente presente en ese estado, y ha sido abandonado, o existe una emergencia que requiera su protección porque ha recibido amenazas o ha estado expuesto a maltrato o abuso;*

*D. surge que ningún otro estado tiene jurisdicción según los criterios A, B, C, y E; u otro estado ha declinado ejercitarla bajo el fundamento de que el Estado cuya jurisdicción está en controversia es el foro más apropiado para determinar tal custodia y es en pro del menor que ese otro tribunal asume jurisdicción;*

*E. El tribunal de ese estado tiene jurisdicción continua a base del inciso anterior."*

*Perrón v. Corretjer, supra*, a las págs. 602-603. Véase además, 28 U.S.C.A. sec. 1738A (c)(2)(A-E).

Como vimos, la P.K.P.A. provee cinco bases jurisdiccionales: (1) la jurisdicción del estado-residencia; (2) la jurisdicción de conexión significativa; (3) la jurisdicción de emergencia; (4) la jurisdicción cuando ningún otro estado tiene jurisdicción bajo las disposiciones del P.K.P.A., o cuando un estado con jurisdicción decline ejercitarla, y (5) la jurisdicción continua. Excepto por la jurisdicción de emergencia, la cual es utilizada como un remedio temporero a utilizarse sólo en circunstancias extraordinarias, las primeras cuatro jurisdicciones están mencionadas en orden de preferencia. La jurisdicción continua, por su parte, es la base jurisdiccional preferida en procedimientos de modificación de custodias. Véase: Manuel E. Moraza Choizne, *supra*, pág. 321.

La jurisdicción del estado-residencia del menor es la base jurisdiccional que tiene prioridad sobre las otras. Véase sobre el particular, **Case Comment: Parent and Child-Interstate Custody: the North Dakota Supreme Court declines to decide whether the six month temporary presence of a child in North Dakota is sufficient to exercise home state jurisdiction.** 76 N. Dak. L. Rev. 697, a la pág. 70.

La P.K.P.A. define el estado residencia como:

*"Aquél en donde el menor ha vivido con ambos padres o sólo con uno o cualquiera otro "custodio" al menos por los seis meses consecutivos que anteceden inmediatamente a la fecha de radicación del procedimiento. En el caso de un niño o niña menor de seis meses, el estado en que el menor vivía desde su nacimiento con cualquiera de las personas antes mencionadas. Períodos de ausencia temporera de cualquiera de estas personas que cuentan como parte de los seis meses u otro período."*

Véase, Ruth E. Ortega Vélez, *La Protección Jurisdiccional del Menor con Ocasión del Divorcio de sus Padres: La Cuestión Jurídica*, Ediciones Situm, Santurce, P.R., 1996, pág. 125; 28 U.S.C. sec. 1738A (b)(4) ▇ énfasis suplido.

Para el año que el gobierno federal aprobó la P.K.P.A., es decir, en el año 1980, la gran mayoría de los estados ya habían adoptado la U.C.C.J.A. con muy pocas modificaciones. A finales del año 1983, los cincuenta estados ya la habían adoptado. Andrea Lockhart, *supra*, pág. 540. Dado el hecho de que todos los estados adoptaron la U.C.C.J.A., y de que la misma contiene aspectos procesales que pueden ser de gran ayuda para determinar el estado con jurisdicción en asuntos de custodia, ésta puede servir de complemento a la P.K.P.A. Sin embargo, es importante destacar que en la medida que la P.K.P.A. discrepe de las diferentes versiones de la U.C.C.J.A. adoptadas en los diferentes estados, la P.K.P.A. ocupa el campo y por consiguiente, prevalecerá sobre las otras leyes. Moraza Choizne, *supra*, pág, 320.

### III

En el estado de California también se aprobó la U.C.C.J.A. En dicha ley se especificaban los procedimientos y requisitos para el ejercicio de jurisdicción en aquellos casos de custodia de menores, en los que tribunales de otros estados pudieran tener o hubiesen ejercitado jurisdicción previamente. Sin embargo, el 10 de octubre de 1999, comenzó a regir una nueva ley en California que derogó la anterior U.C.C.J.A. Esta nueva ley se conoce como *"Uniform Custody Jurisdiction and Enforcement Act"* (U.C.C.J.E.A.), Cal Fam. Code, sections 3400 *et. seq.* La U.C.C.J.E.A. alteró en varios aspectos la ley anterior, entre éstos: (1) proveer una base jurisdiccional exclusiva para hacer determinaciones iniciales de custodia; (2) revisó los factores a tomarse en consideración por el tribunal para determinar si es un foro inconveniente, y (3) amplió las disposiciones referentes a la puesta en vigor de los dictámenes de custodia de otro estado.

La definición de *"home state"* o estado-residencia es similar a la de P.K.P.A. El concepto se define de la siguiente forma en el estatuto de Califoria, *supra*, sec. 3402:

*"Part 3. Uniform Child Custody Jurisdiction and Enforcement Act.*

*Chapter I. General Provisions*

*3402. As used in this part*

*(g) "Home state" means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which a child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period."*

La ley de California también dispone en la Sección 3421 que dicho estado tendrá jurisdicción para hacer una determinación inicial de custodia si se da una de las diversas condiciones contempladas. La primera condición mencionada es que California sea el *"home state"* o estado-residencia del menor a la fecha del comienzo del proceso, o era el estado-residencia del menor durante los seis (6) meses anteriores al comienzo del proceso y el menor está ausente del estado, pero un padre o persona actuando como padre continúa viviendo en California. Sec. 3421(a)(1) ▇

En segundo lugar, el estado de California podría tener jurisdicción si el tribunal de otro estado no tiene jurisdicción bajo las disposiciones anteriores, o cuando el tribunal del estado-residencia haya declinado ejercer jurisdicción bajo el fundamento de que California es el foro más apropiado. En ese caso, el menor y sus padres o el menor y al menos uno de los padres, deberán tener conexión significativa con California más allá de una mera presencia física. En ese caso también será necesario que en California esté disponible evidencia sustancial

concerniente al cuidado, protección, entrenamiento y relaciones personales del menor. Sec. 3421(a)(2)(A)(B) ■

En tercer y cuarto lugar, California podría tener jurisdicción si todos los tribunales con jurisdicción declinaron ejercitarla bajo el fundamento de que California es el foro más adecuado para determinar la custodia del menor, o cuando ningún estado tenga jurisdicción a base de todos los criterios anteriormente mencionados. Sec. 3421(a)(3)-(4) ■

Es de suma importancia señalar que el estatuto de California dispone expresamente en su Sección 3426(a) que un tribunal de dicho estado no deberá ejercer jurisdicción si, al momento del comienzo del proceso, **otro proceso sobre la custodia de un menor** ya comenzó en un tribunal de otro estado con jurisdicción de conformidad con dicho estatuto. El estatuto de California define el término *"child custody proceeding"* como un procedimiento en el cual está en controversia la custodia legal, la custodia física o visitas relacionadas con un menor. *Cal Fam. Code, supra,* sec. 3402(d).

Incluso, la Sección 3426(b) dispone que si el tribunal de California determina que otro procedimiento sobre custodia ya comenzó en otro estado con jurisdicción de conformidad con el estatuto, deberá paralizar los procedimientos y comunicarse con el tribunal de ese otro estado. Si el tribunal de ese otro estado no determina que el tribunal de California es un foro más apropiado, el tribunal de California deberá desestimar el proceso ante sí. ■

La anterior disposición del estatuto de California (U.C.C.J.E.A.) es cónsona con la P.K.P.A. Esta última dispone que el tribunal de un estado no podrá ejercitar jurisdicción en ningún proceso para determinar custodia o derechos de visita si hay otro proceso pendiente en otro estado sobre el mismo particular. *Supra,* sec. 1738A(g).

## IV

En *Perrón v. Corretjer, supra,* se examinó por primera vez el alcance y aplicación del *"Parental Kidnapping Prevention Act"* en Puerto Rico. Como resolvió el Tribunal Supremo de Puerto Rico, la ley federal es de aplicación en esta jurisdicción, porque Puerto Rico está expresamente incluido en la definición de estado de la sección 1738A(b)(8). Véase además, *Ortega, Jr. v. Morales Ortega,* 131 D.P.R. 783 (1992). Es por esa razón que cuando Puerto Rico es la jurisdicción de residencia bajo las disposiciones de la P.K.P.A., las determinaciones de nuestros tribunales deberán ser respetadas por otras jurisdicciones estatales y territoriales. *Pérez Pascual v. Vega Rodríguez,* 124 D.P.R. 529, 537 (1989); *Sterzinger v. Ramírez,* 116 D.P.R. 762 (1985). Así también, los tribunales de Puerto Rico están obligados, según las disposiciones de P.K.P.A., a otorgarle entera fe y crédito a un decreto de custodia válidamente emitido por cualquier estado de la unión o territorio. *Pérez Pascual v. Vega Rodríguez, supra.*

El bienestar de los menores es la espina dorsal de la legislación federal y local. *Perrón v. Corretjer, supra,* a la pág. 604; *Marrero Reyes v. García Ramírez,* 105 D.P.R. 90 (1976). Cónsono con lo anterior, el Tribunal Supremo de Puerto Rico ha establecido cuáles son los elementos de juicio necesarios para evaluar las circunstancias y factores ambientales, sociales y humanos que permitan adjudicar de manera informada en quién debe recaer en última instancia la custodia. Entre esos factores se encuentran: la preferencia del menor, su sexo, edad, salud mental y física; el cariño que puede brindársele por las partes; la habilidad de las partes para satisfacer las necesidades afectivas, morales y económicas del menor, el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia; y la salud síquica de todas las partes. *Perrón v. Corretjer, supra,* a la pág. 606. Ningún factor es decisivo, hay que sopesarlos todos para determinar hacia dónde se inclina la balanza. *Id.; Marrero Reyes v. García Ramírez, supra,* a la pág. 106.

Como indicamos anteriormente, en la P.K.P.A. se le da preferencia al estado residencia del menor, porque se entiende que éste es el que puede determinar lo que es más beneficioso para el niño. Se entiende que es en el

estado-residencia del menor donde con mayor probabilidad está disponible la evidencia que se requiere para hacer una adecuada determinación de custodia. *Ortega Jr. V. Morales Ortega, supra,* a la pág. 792. Sin embargo, *"no será sino hasta que se determine que ningún otro estado podría asumir jurisdicción a la luz de la sección relativa al 'estado-residencia', que se tomará en consideración el criterio de los mejores intereses del menor o que otro estado haya declinado asumir jurisdicción, a menos que el menor se encuentre en ese estado y exista una situación de abandono o emergencia. En virtud de lo anterior, es esencial que se determine el estado-residencia del menor en cuestión para efectos de custodia". Id.,* a la pág. 792.

## V

El demandado-peticionario, Ranlett, solicita a este Tribunal que determine que California es el estado con jurisdicción conforme P.K.P.A., porque alegadamente el menor no llevaba en Puerto Rico seis (6) meses consecutivos previos a la radicación del procedimiento. En segundo lugar, alega que el menor ha permanecido en Puerto Rico en contra de su voluntad. Petición de *certiorari,* a la pág. 17.

De los documentos que constan en autos, se desprende que tanto la demandante-peticionaria, López Cotto, como su hijo, Pablo Esteban, se trasladaron a Puerto Rico en el mes de diciembre de 1998. Aproximadamente diez (10) meses después, es decir, el 6 de octubre de 1999, López Cotto radicó en Puerto Rico el primer recurso legal instado en este caso: la demanda de relaciones paterno-filiales y alimentos contra su esposo, el demandado-peticionario James Allen Ranlett, en la cual también solicitó que se le reconociera la custodia de su hijo.

Luego de ser emplazado en Puerto Rico, el demandado-peticionario, Ranlett, radicó una acción en un tribunal de California solicitando también la custodia de su hijo. Posteriormente, la demandante-recurrida, López Cotto, presentó en Puerto Rico una solicitud de orden para que el menor no fuera trasladado fuera de Puerto Rico. Allí indicó que el demandado-peticionario, Ranlett, *"mintió"* al radicar el caso en California, ya que indicó que el menor vivía con ambos padres en dicho estado cuando en realidad el menor vivía en Puerto Rico con su madre desde diciembre de 1998. Ap. *Cert.,* pág. 17.

En la oposición a esa solicitud de orden, el demandado-peticionario, Ranlett, expuso que el menor vivió con él durante varias ocasiones en el año 1999, además de que su intención era que el menor residiera con él en California y que *"nunca acordó con su esposa que la residencia del menor fuera en Puerto Rico solamente".* Ap. *Cert.,* pág. 23. A esos efectos, el demandado-peticionario, Ranlett, argumentó que tanto el lugar de nacimiento del menor como el lugar de matrimonio de las partes, además de otros factores, debían considerarse y estar sujetos a la credibilidad que le diera el tribunal en una vista a tales efectos, antes de establecerse si el tribunal de Puerto Rico o el de California tenían jurisdicción. *Id.* Eso último fue lo que precisamente hizo el Tribunal de Primera Instancia en Puerto Rico, luego de dictar una orden el 24 de noviembre de 1999 para que el menor no fuera trasladado fuera de la jurisdicción.

Sorprendentemente, en esa misma fecha, 24 de noviembre de 1999, el tribunal de California dictó una orden para que el menor fuera trasladado a California, reclamando ser el foro con jurisdicción. Nótese que previo a la radicación del recurso de custodia en California, ya estaba pendiente en Puerto Rico el caso presentado por la demandante-peticionaria, López Cotto, en el cual solicitó entre otras cosas, que se le reconociera la custodia *"de hecho"* sobre el menor. Ap. *Cert.,* pág. 2.

## VI

Es importante referirnos al dictamen del tribunal de California, emitido el 24 de noviembre de 1999. Dicho tribunal, como paso previo para determinar que poseía jurisdicción, interpretó las disposiciones de la Convención de la Haya y una serie de jurisprudencia relacionada a incidentes de custodia entre personas de diferentes nacionalidades, por ejemplo de Alemania y Francia. El título de dicha convención lo es *"Hague Conference on Private International Law: Convention on the Civil Aspects of International Child Abduction".* Este tratado internacional se firmó el 25 de octubre de 1980 y entre sus países signatarios se encuentra los Estados Unidos de

América. Los propósitos principales de esa convención son: (a) asegurar el pronto retorno o devolución de niños erróneamente retenidos o removidos hacia uno de los países contratantes, y (b) asegurar que los derechos de acceso y de custodia bajo la ley de uno de los países contratantes sean efectivamente respetados en los otros países contratantes. Hague Convention on the Civil Aspects of Child Abduction, Art. 1.

Posteriormente, el Congreso de los Estados Unidos aprobó la ley conocida como *"International Child Abduction Remedies Act"* (*"ICARA"*) con el propósito de implementar la antes mencionada convención internacional. 42 U.S.C.. § 11601 *et. seq*. La convención internacional e *"ICARA"* aplican cuando un menor ha sido removido de su residencia habitual en violación de los derechos de custodia de la parte peticionaria. El peticionario establece un caso *prima facie* de remoción ilegal demostrando por preponderancia de la evidencia: (1) la residencia habitual del menor inmediatamente antes de la fecha de la remoción era en el país extranjero; (2) la remoción violó los derechos de custodia del peticionario bajo las leyes del país extranjero; y (3) el peticionario ejercitaba la custodia del menor al momento de la remoción. 42 U.S.C. § 11603(e)(1)(A); Hague Convention Art. 3; *Lops v. Lops,* 140 F.3d. 927, 936 (11th. Cir. 1998).

El tribunal de California interpretó incorrectamente que el menor fue llevado a un país extranjero y por eso aplicó el tratado de La Haya. En realidad, el menor nunca salió del territorio estadounidense. El Estado Libre Asociado de Puerto Rico es un territorio *"perteneciente"* a Estados Unidos, Art. 1 de la Ley de Relaciones Federales, 39 Stat. 951; *Harris v. Rosario,* 446 U.S. 651 (1980); con una relación *"sin paralelo"* en la historia constitucional estadounidense, *Califano v. Torres,* 435 U.S. 1, 3 (1978); ya que el territorio fue el primero en poseer un gobierno propio establecido bajo su propia Constitución █ Dicha Constitución se aprobó por ley del Congreso, tras el voto afirmativo del Pueblo de Puerto Rico, es decir mediante un proceso que tuvo el *"carácter de un convenio"*. Véanse, Ley Núm. 600 de 3 de julio de 1950, 64 Stat. 314; *Calero Toledo v. Pierson Yacht Leasing Co.,* 416 U.S. 663 (1974).

Aunque la adopción de la Constitución del Estado Libre Asociado de Puerto Rico no alteró la soberanía del Congreso sobre el territorio, bajo el Art. IV, Sec. 3, Cl. 2 de la Constitución federal, *Harris v. Rosario, supra, United States v. Torres,* 826 F.2d. 1084, 1088 (1st. Cir. 1987); la autoridad del Gobierno de Puerto Rico es similar a la de un estado de la Unión, *Alfred L. Snapp & Son v. Puerto Rico,* 458 U.S. 592 (1982); con autonomía plena sobre sus asuntos internos. *Puerto Rico v. Branstad,* 483 U.S. 219, 230 (1987); *Rodríguez v. Popular Democratic Party,* 457 U.S. 1 (1978); *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 594 (1976) █

Por lo tanto, no es de extrañar que Puerto Rico esté expresamente incluido dentro de la definición de *"estado"* que provee la *"Parental Kidnapping Prevention Act"* e incluso en el propio estatuto de California. Véase Cal. Fam. Code sec. 3402 (o); 28 U.S.C.A. sec. 1738A(b)(8).

En segundo lugar, y como autoridad supletoria, el tribunal de California hizo referencia en su dictamen a la U. C.C.J.A. de dicho estado y a P.K.P.A. En cuanto a esas autoridades, el tribunal se limitó a decir que el menor no había vivido en otra jurisdicción por seis meses consecutivos, por lo que era el único tribunal con jurisdicción. Ap. <u>Cert.</u>, pág. 50.

Conforme a las disposiciones de P.K.P.A., un estado no debe asumir jurisdicción si hay otro estado que está ejerciendo jurisdicción conforme a las disposiciones de dicha ley. Sec. 1738A (g), *supra*. Por otro lado, la propia Sección 3426 de la U.C.C.J.E.A. de California dispone claramente que un tribunal de ese estado no deberá ejercer jurisdicción bajo dicho capítulo, si al momento de comenzar el procedimiento de custodia, ya había comenzado un procedimiento similar en un estado con jurisdicción de conformidad con dicho estatuto. Precisamente eso era lo que sucedía en este caso, ya que en Puerto Rico estaba pendiente un procedimiento en el cual uno de los asuntos a dilucidarse era la custodia del menor Pablo Esteban Ranlett López.

La ley de California dispone que en caso de que el tribunal de dicho estado determine que un proceso de custodia ya comenzó en otro estado con jurisdicción de conformidad con el estatuto, éste le impone la obligación de paralizar los procedimientos ante sí y comunicarse con el otro estado. En caso de que ese otro estado no considere que California es un foro más conveniente, California deberá desestimar el procedimiento.

Ante todo lo anteriormente mencionado, salta a la luz el desconocimiento del tribunal de California del alcance de su propio estatuto y de la clasificación de Puerto Rico dentro de la ley estatal y la federal. Es obvio entonces que no determinó si Puerto Rico era un estado con jurisdicción sustancialmente de conformidad con P.K. P.A. o con la U.C.C.J.E.A., antes de decidir si California contaba o no con jurisdicción ▓ a pesar que en Puerto Rico se había radicado previamente un procedimiento donde se solicitó la adjudicación de peticiones similares a las presentadas en California y de lo cual el tribunal de ese estado tenía conocimiento.

## VII

Las determinaciones de hechos que hiciera el Tribunal de Primera Instancia están sustentadas en la prueba vertida durante la vista sobre el aspecto jurisdiccional.

Se desprende de la transcripción de la prueba que la demandante-recurrida, López Cotto, se casó con el demandado-peticionario, Ranlett, en el 1989 en el estado de California. Todos los veranos viajaban a Puerto Rico excepto en un sólo año en que no viajaron. E.N.P., pág. 29. Durante esos viajes a Puerto Rico, López Cotto le informó a Ranlett que interesaba mudarse a Puerto Rico, e incluso exploraron ideas para establecerse aquí. E.N.P., pág. 31.

En el mes de septiembre de 1998, López Cotto viajó a Puerto Rico y le comentó a Ranlett que quería quedarse aquí. E.N.P., pág. 32; tomar una clase de bienes raíces y traerse a Pablo (el menor hijo de ambos) a Puerto Rico. E.N.P., pág. 32-33. Entre septiembre y noviembre de 1998, estando aún en Puerto Rico, López Cotto conversó con Ranlett sobre su interés de venir a Puerto Rico. Este le contestó que sí. Luego tuvieron otra conversación en la que él le dijo que no, pero luego volvió a llamar a López Cotto y le dijo: *"está bien [,] dale"*. E.N.P., pág. 33.

López Cotto llegó a un acuerdo con Ranlett para que ella se trasladara a Puerto Rico a tomar el curso de bienes raíces, profesión que no podría ejercer en California. E.N.P., pág. 35. En enero o febrero de 1999, López Cotto compró un vehículo en Puerto Rico. E.N.P., pág. 36.

El niño Pablo viajó a California el 19 de marzo de 1999 para estar con su papá, Ranlett. El 8 de abril de 1999, López Cotto viajó a California a buscar a Pablo, ya que habían acordado que él lo llevaría y ella lo iría a buscar. E.N.P., pág. 41.

El 18 de junio de 1999, Ranlett buscó al niño en Puerto Rico y lo regresó nuevamente el 27 de julio de 1999. E.N.P., págs. 42-43. Ranlett trajo al niño en julio de 1999 porque empezaba la escuela. López Cotto esperaba matricularlo en el Centro Episcopal que empezaba clases el 2 o 3 de agosto de 1999. E.N.P., pág. 45.

Ranlett envió a Puerto Rico, vía *"fax"*, el acta de nacimiento de Pablo e hizo en California las gestiones para solicitar una segunda tarjeta de seguro social para el menor. Todo ello lo hizo con el fin de que el menor pudiera ser matriculado en la escuela en Vieques, Puerto Rico. E.N.P., pág. 48.

Por otro lado, López Cotto le solicitó a Ranlett que le consiguiera las transcripciones de crédito de ella para poder tomar el examen de bienes raíces. E.N.P., pág. 49. Ranlett hizo las gestiones y López Cotto pudo tomar el examen en Puerto Rico. E.N.P., pág. 50. Incluso, Ranlett envió a Puerto Rico la computadora de su esposa (E.N. P., pág 50) y luego la instaló. E.N.P., pág. 52.

En el contrainterrogatorio realizado a López Cotto se desprendió que cuando el menor iba a California era

porque ambos padres sabían que *"Pablo iba a visitar, por eso volvía"*. E.N.P., pág. 76.

En cuanto al testimonio del demandado-peticionario, Ranlett, éste testificó que vive en Roseville, California, desde el 1991. E.N.P., pág. 98. Sus padres viven en Sacramento, California, y sus hermanos en varios suburbios de dicho estado. E.N.P., pág. 98.

Testificó también Ranlett que su hijo Pablo nació en California en 1996 (E.N.P., pág. 99) y que durante 1998 vivió en Roseville, California. Testificó también que Pablo *"visitó en Puerto Rico a su madre"*. E.N.P., pág. 99.

De acuerdo al testimonio del demandado-peticionario, Ranlett, el menor *"vivió"* en Roseville, California, aproximadamente desde marzo 18 al 19 de abril de 1999 y luego del 18 de junio al 28 de julio de 1999. E.N.P., pág. 99. El resto del tiempo el menor estuvo en Puerto Rico. E.N.P., pág. 112.

El demandado-peticionario, Ranlett, también testificó que tanto él como la demandante-peticionaria, López Cotto, habían discutido cómo compartir al menor de manera igual en California y en Puerto Rico. E.N.P., pág. 102. Testificó además que le dijo a López Cotto *"yo no quería hacer un compromiso sobre dónde Pablo va a ir a la escuela"*. E.N.P., págs. 103-104. Al momento de decir eso tampoco descartó a Puerto Rico. E.N.P., pág. 114.

El demandado-peticionario, Ranlett, admitió que envió a Puerto Rico un monitor, una calculadora, una impresora y compró una computadora, la cual también envió. E.N.P., págs. 116 y 117. También testificó que preguntó si había trabajo disponible en Puerto Rico, pero no había. E.N.P., pág. 120. Admitió también que en marzo de 1999 entregó un resumé para indagar si existía una posición para la cual cualificara. E.N.P., págs. 121-122. Admitió también que esas gestiones las hace alguien que está en busca de trabajo en Puerto Rico. E.N.P., pág. 122. Sin embargo, dijo que su intención en 1999 era que su hijo Pablo se quedara en California. E.N.P., págs. 125.

Al estudiar los alegatos de las partes, los documentos ante nuestra consideración y la transcripción de la prueba vertida en la vista en su fondo, podemos llegar a la conclusión de que el menor no estuvo seis meses consecutivos ni en Puerto Rico **ni en California** antes de presentarse la demanda de alimentos y relaciones paterno-filiales por parte de la demandada-recurrida, López Cotto.

Como vimos, la definición de *"home state"* de P.K.P.A. claramente establece que será el estado-residencia aquél dónde el menor ha vivido con ambos padres o sólo con uno, al menos por los seis meses consecutivos inmediatamente a la fecha de la radicación del procedimiento. Expone claramente dicho estatuto que períodos de ausencia temporera de cualquiera de estas personas se cuentan como parte de los seis meses u otro período.

Ante esta disyuntiva, era necesario que el tribunal de Puerto Rico llevara a cabo una vista como la celebrada para determinar cuáles eran las intenciones de las partes al momento en que López Cotto se trasladó a Puerto Rico, específicamente a la isla de Vieques, junto con el menor. Sólo así podrían dilucidarse las razones por las cuales el menor viajó entre Puerto Rico y California, para así determinar si los períodos que el menor se ausentó de ambas jurisdicciones, podían catalogarse como los períodos de ausencia que el estatuto federal contempla que formen parte de los seis meses que el menor debe vivir en determinado estado para que éste advenga finalmente a ser su estado-residencia.

Es norma ampliamente reconocida que el alcance de la revisión judicial sobre cuestiones de hecho está regulado por lo dispuesto en la Regla 43.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III. Esta dispone que las determinaciones de hecho basadas en testimonio oral no se dejarán sin efecto, a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos. Respecto a la revisabilidad de la prueba, estamos impedidos de intervenir con la apreciación de la prueba que hizo el Tribunal de Primera Instancia, en ausencia de pasión, prejuicio, parcialidad o

error manifiesto. *Argüello López v. Argüello García*, Opinión de 31 de agosto de 2001, **2001 J.T.S. 127**; *Trinidad García v. Chade*, Opinión de 18 de enero de 2001, **2001 J.T.S. 10**; *Rolón García v. Charlie Car Rental*, Opinión de 2 de junio de 1999, **99 J.T.S. 89**.

No encontramos que haya error manifiesto o parcialidad en las determinaciones de hecho del Tribunal de Primera Instancia, tal y como alega el demandado-peticionario, Ranlett. Se desprende con claridad de la prueba vertida que el demandado-peticionario, Ranlett, conocía de las intenciones de su esposa de radicarse en Puerto Rico junto con su hijo. Es muy elocuente el hecho de que él ayudó no sólo a la demandante-peticionaria para que estudiara en Puerto Rico, sino que también hizo las gestiones para conseguir los documentos necesarios para matricular a su hijo en la escuela. Sus visitas constantes a Puerto Rico también denotan ese conocimiento. ■

Por otro lado, las gestiones que hiciera el demandado-peticionario para conseguir trabajo en Puerto Rico dan a entender su intención de permanecer también en el territorio, aunque esas gestiones según su testimonio no dieron resultado. En consecuencia, del propio testimonio de Ranlett no se desprende que el menor hubiese estado en Puerto Rico en contra de su voluntad, lo cual es precisamente una de sus alegaciones.

El hecho de que el menor hubiese pasado con el demandado-peticionario, Ranlett, aproximadamente ochenta días en California entre los meses de marzo, abril, junio y julio, no eliminan el hecho de que posteriormente el padre devolvió el niño a Puerto Rico para que comenzara la escuela en agosto. Es importante recalcar además que ya la demandante-recurrida, López Cotto, estaba establecida en una casa propiedad de sus abuelos en Vieques, tenía un vehículo desde principios de 1999 y aunque no aprobó el examen de bienes raíces, se encontraba trabajando en el Fideicomiso de Conservación e Historia de Vieques desde el mes de agosto de 1999.

Dado ese trasfondo fáctico, podemos concluir que no erró el Tribunal de Primera Instancia al concluir que el estado-residencia del menor es Puerto Rico. Aunque el menor estuvo ausente de Puerto Rico por aproximadamente ochenta días durante 1999, el resto del tiempo lo pasó en Puerto Rico, con el consentimiento y ayuda de su padre, quien también hizo gestiones para conseguir un empleo en Puerto Rico. Por lo tanto, no podemos estar de acuerdo con la expresión del tribunal de California en el sentido de que hubo un *"intento unilateral"* de una de las partes para trasladar al menor. Véase, Ap. <u>Cert.</u>, pág. 47.

Por todo lo anterior, es forzoso concluir, entonces, que el foro con jurisdicción para atender el pleito de relaciones paterno-filiales y custodia del menor Pablo Esteban Ranlett López es Puerto Rico y no California. La disposición controlante de P.K.P.A. es la Sección 1738A (c)(2)(A)(i), la cual postula que un foro podrá dictar válidamente una determinación de custodia si ese era el estado residencia del menor a la fecha en que se iniciaron los procedimientos. Era obvia, entonces, la necesidad de realizar una vista para llegar a esa conclusión.

Dada la conclusión a la que llegamos, resulta innecesario entonces discutir un aspecto que el demandado-peticionario argumentó en varias ocasiones. En síntesis, alegó que el Tribunal de Primera Instancia erró al adoptar la conclusión de la examinadora de pensiones alimentarias en el sentido de que el menor no estuvo seis meses consecutivos, pero sin embargo concluyó que Puerto Rico era el foro con jurisdicción. Como ya discutimos, el hecho de las ausencias del menor no es lo determinante en este caso, sino las razones por las que se ausentó y las razones por las cuales posteriormente regresó y se estableció en Puerto Rico, con el consentimiento de sus padres. En eso se enfocó el Tribunal de Primera Instancia y llegó a las conclusiones antes expuestas, las cuales se avalan con la prueba.

## VIII

Por los fundamentos antes expuestos, se deniega la expedición del auto solicitado.

Así lo acordó el Tribunal y lo certifica la Secretaria General.

**ESCOLIOS 2002 DTA 80**

**1.** En la Resolución dictada en el caso el 28 de diciembre de 2000, el propio tribunal señala que por error tituló dicho dictamen como una sentencia, cuando en realidad era una resolución que no ponía punto final a la controversia. Ap. *Cert.*, pág. 277.

**2.** Presumimos que el tribunal quiso decir que la Sra. López Cotto abandonó Puerto Rico, ya que al mudarse a California nunca abandonó la jurisdicción de los Estados Unidos.

**3.** De nuevo, presumimos que el tribunal quiso decir la Isla de donde es oriunda la Sra. López Cotto, ya que como ciudadana americana por nacimiento, su país es el mismo de su esposo: los Estados Unidos de América. El sentido coloquial del vocablo *"país"* empleado por el tribunal es confuso en el contexto de una determinación jurisdiccional de custodia como la que nos ocupa.

**4.** Sec. 1738A. Full Faith and credit given to child custody determinations

(b) As used in this section, the term *"home state"* means the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as a parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons are counted as part of the six-month or other period.

**5.** Chapter 2: Jurisdiction

§3421. Jurisdiction to make an initial custody determination.

(a): Except as otherwise provided in Section 3424, a court of this state has jurisdiction to make an initial child custody determination only if any of the following are true:

(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state, but a parent or person acting as a parent continues to live in this state.

**6.** (2) A court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the grounds than this state is the more appropriate forum under section 3427 or 3428, and both of the following are true:

(A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than the mere physical presence.

(B) Substantial evidence is available in this state concerning the child's care, protection, training and personal relationships.

**7.** (3) All courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under section 3427 or 3428.

(4) No court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2) or (3).

**8.** **§3426. Simultaneous proceedings in another state.**

Except as otherwise provided in section 3434, a court of this state may not exercise jurisdiction under this chapter if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state having jurisdiction substantially in conformity with this part, unless the proceeding has been terminated

or is stayed by court of the other state because a court of this state is a more convenient forum under section 3427.

Except as otherwise provided in section 3424, a court of this state, before hearing a child custody proceeding, shall examine the court documents and other information supplied by the parties pursuant to section 3429. If the court determines that a child custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with this part, the court of this state shall stay its proceeding and communicate with the court of the other state. If the court of the state having jurisdiction substantially in accordance with this part does not determine that the court of this state is a more appropriate forum, the court of this state shall dismiss the proceeding.

9. Luego, en 1960, el territorio de Samoa Americana redactó y aprobó su propia constitución, y en 1986, el territorio de las Islas Marianas del Norte hizo lo propio, estableciendo un Estado Libre Asociado o *"`commonwealth´ con gobierno propio... en unión política con y bajo la soberanía de los Estados Unidos de América...."*. Marianas Covenant, Sec. 101 (traducción nuestra).

10. Además de lo anterior, debemos aclarar que la traducción oficial del Estado Libre Asociado al idioma inglés es *"Commonwealth of Puerto Rico"*, no *"Associated Free State of Puerto Rico"*, como señaló incorrectamente el tribunal de California. Véase, Resolución Núm. 22 de la Convención Constituyente de Puerto Rico, 1 L.P.R.A.

11. Es importante señalar además que el tribunal de California sí se comunicó con el Tribunal de Puerto Rico para determinar cuál de las dos jurisdicciones debía retener el caso para dilucidarlo en los méritos. Esa comunicación se efectuó casi un mes después de que el tribunal de California **se declaró con jurisdicción sobre este asunto** (véase Ap. *Cert.*, pág. 273), a pesar de que la ley de California dispone que dicha comunicación deberá hacerse cuando el tribunal de California determina que hay otro procedimiento en otro estado con jurisdicción de conformidad con dicho estatuto. Cal Fam. Code, *supra*, sec. 3426. California nunca llegó a esa conclusión respecto a Puerto Rico.

Al momento de recibir esa comunicación por parte del tribunal de California, el Tribunal de Primera Instancia de Puerto Rico la declinó bajo el fundamento de que *"para poder emitir una decisión sobre las controversias planteadas, sería menester celebrar una audiencia evidenciaria, aquilatar los testimonios vertidos en corte, la documentación que se provea como prueba admitida e interpretar las leyes y no meramente sostener una conversación con el juez de la otra jurisdicción invocada."* Ap. *Cert.*, pág. 273.

Por esa razón, el tribunal de Puerto Rico realizó una vista sobre el aspecto jurisdiccional en la que se recibió prueba de ambas partes, algo que tenía que hacerse según expondremos más adelante, y en la que se dilucidó la intención de las partes al trasladarse a Puerto Rico.

12. Las partes estipularon que el demandado-peticionario, Ranlett, estuvo en Puerto Rico para las siguientes fechas: (1) desde el 23 de febrero al 2 de marzo; (2) desde el 17 de marzo al 19 de marzo; (3) desde el 14 al 18 de junio, y (4) desde el 28 de Julio al 1ro. de agosto de 1999. Ap. *Cert.*, pág. 92.